**URI COGENERATION PARTNERS, L.P. and Kingston Power Associates, Limited Partnership, Plaintiffs,**

v.

**BOARD OF GOVERNORS FOR HIGHER EDUCATION and University of Rhode Island, Defendants.**

**Civ. A. No. 93–0474–L.**

United States District Court,
D. Rhode Island.

Feb. 23, 1996.

---

Gregory L. Benik, Robin–Lee Main, Mc-Govern, Noel & Benik, Providence, RI, for Plaintiffs.

Curtis R. Diedrich, David J. Hatem, War-ren D. Hutchison, Burns & Levinson, Boston,

MA, Jay S. Goodman, Providence, RI, for Defendants.

### OPINION AND ORDER

LAGUEUX, Chief Judge.

Despite the best laid plans, the only sparks and steam ever produced by the URI cogeneration facility have been in this Court. This matter is before the Court on defendants' motion for clarification of the Court's September 15, 1994 denial of defendants' motion for summary judgment. The defendants, the Board of Governors for Higher Education for the State of Rhode Island (the "Board") and the University of Rhode Island ("URI") (collectively, the "Board"), seek an Order pursuant to Fed.R.Civ.P. 56(d) delineating what factual and legal issues remain for trial. Plaintiffs URI Cogeneration Partners, L.P., and Kingston Power Associates, L.P. (collectively, "UCP"), oppose the Board's motion, asserting by turn that genuine issues of fact exist as to every one of their claims, or that UCP should prevail as a matter of law.

To winnow out the numerous claims and defenses in this matter, the Court grants the Board's motion and issues the following Rule 56(d) Order. For the reasons set forth below, the Court concludes that (i) as a matter of law, the Board ratified the URI general counsel's termination of UCP; (ii) determination of whether the Board breached the agreement with UCP must await trial, as UCP has raised triable issues of fact with regards to chronology, substantial performance, and waiver; (iii) the contract's *force majeure* clause, as a matter of law, did not relieve UCP of its obligations under the agreement; (iv) under the express terms of the contract, UCP may not seek indirect, special or consequential damages; (v) resolution of the Board's counterclaim must await trial, as it is predicated on the same factual determinations that will support, or defeat, UCP's contract claims.

The Court will also treat the Board's motion for clarification as a motion for reconsideration under Fed.R.Civ.P. 56(c), insofar as the Court amends its earlier denial of summary judgment. The Court now grants summary judgment to the defendants on Count I of the Complaint, which alleges that URI and the Board breached the agreement through URI's allegedly unilateral termination of UCP, and on Counts VI and VII, which allege that URI tortiously interfered with the parties' agreement, since under Rhode Island law, a party may not tortiously interfere with its own contract.

### I. Factual Background

A cogeneration facility is a power plant which produces both steam, for heat, and electricity, which may be transmitted to a local power grid and sold. The power sales subsidize the price of steam production, lowering the cost of heat available to the plant's owner. For this reason, URI became interested in building a cogeneration facility on its Kingston campus in the mid-eighties, a time when the school was simultaneously trying to replace its decaying heating plant and cut its energy costs.

In 1987, URI, the Board, and the state of Rhode Island began soliciting bids for the construction of a cogeneration facility. In time, the Board selected a group of developers (the future plaintiffs in this case), and negotiations began in earnest. For two years—from 1988 until 1990—the parties wrestled with the myriad issues involved in the plant's construction and operation before coming to agreement.

During this period, the question of zoning arose and coalesced into a major debate. The Board maintained that the on-campus construction site was not subject to local zoning, and that the plant could be built without permission from the South Kingstown Zoning Board. South Kingstown, in turn, asserted regulatory jurisdiction over the facility; a public meeting held on April 4, 1990 between URI, UCP and local residents only brought more questions—now environmental—to the fore. UCP, for its part, cared less about jurisdiction than about financing: the partnership's advisors believed that absent approval of the South Kingstown authorities, construction loans would not be available. The scope of the project had grown from 28 megawatts to 54 megawatts, with a concomitant rise in costs, and UCP was anxious to preserve an adequate supply

of capital. Ultimately, choice of whether to seek zoning approval was left in UCP's hands.

On September 4, 1990, the parties met to sign the Energy Services Agreement ("ESA"), the contract governing the plant's design, construction and operation. Under the agreement, the "Customer" was, jointly, the Board of Governors for Higher Education for the State of Rhode Island and the University of Rhode Island. ESA at 6. The "Service Company" was Kingston Power Associates, Limited Partnership, *id.*, a Rhode Island limited partnership with a principal place of business ("p.p.b.") in Boston, Massachusetts. KPA's general partner was Meridian Kingston Corporation and its limited partner was Meridian Power Corporation. Both were Massachusetts corporations with p.p.b. in Boston. Sometime thereafter, the parties also executed and delivered a Land Lease.

The exact dates on which the ESA and the Land Lease were executed and delivered must await determination at trial; no other factual issue so predominates this matter. The Board maintains that the ESA was executed on September 4, 1990, the day of the signing, Affidavit of Mary E. Kennard at ¶ 8, and the Land Lease was executed and delivered together with the ESA on September 11, 1990. *Id.* at ¶ 9. UCP has offered evidence that the fully executed ESA—additional signatures were procured after September 4—and Land Lease were delivered no earlier than September 20, 1990.[1] William F. Quinn's Response to Defendants' First Set of Interrogatories at 3. (UCP has also offered evidence that the fully executed ESA was delivered on or after October 1, 1990. Affidavit of William E. Harper at 2.) Therefore, according to the Board, both the ESA and the Land Lease were fully executed and delivered by September 11, 1990; UCP argues for September 20, 1990 at the earliest.

Nine days would seem of little importance, were it not for the structure of the ESA. The contract entered into by the Board and UCP established a rigid and complicated schedule of deadlines, penalties and termination points in order to insure that the cogeneration facility would be built and operating within a set period of time. With age and frailty overwhelming the existing URI heating plant, the Board obviously wanted to guarantee that the cogeneration facility would replace it forthwith.

Section 5.2 of the ESA governs the projected milestones and penalties. As multiple claims and defenses arise out of this section, the Court will quote pertinent parts at length:

Section 5.2: *Project Milestones: Detailed Description.*

This Section 5.2 sets forth the Project Milestones to be met by Service Company. In the event that such Project Milestones are not met, Service Company may be penalized, or the Project may be terminated, as provided in this Section 5.2 . . . .

Unless excused by an event of Force Majeure under the terms of Section 21 hereof, Service Company shall meet the Project Milestones set forth following in this Section 5.2 and, notwithstanding anything elsewhere in this Agreement which may be to the contrary, any failure of Service Company in this regard shall be treated in accordance with the provisions of this Section 5.2:

(a) **Permit Application Milestone.** Service Company shall have prepared and filed all necessary applications for all governmental permits, approvals, licenses and authorizations required to construct and operate the System no later than *the Milestone Start Date (the date of execution and delivery by the Parties of this Energy Services Agreement and the Land Lease of even date; or the date upon which the latter of the two is executed and delivered if not executed on the same date);* provided, however, any such application which in the prudent planning of a project such as the System would not be filed until a later date . . . need not be filed solely to achieve this milestone[.]

---

**1.** William F. Quinn's Response to Defendants' First Set of Interrogatories actually states that the "fully executed Agreements" arrived in Meridian's offices on the morning of "September 20, 1994," *id.* at 3; the Court will assume the year is a misprint.

(Emphasis added.) The Milestone Start Date ("MSD") defined in § 5.2(a) was intended to be the date certain from which all the later milestones were to be determined. Unfortunately, the factual dispute over the exact date on which both the ESA and Land Lease were finally executed and delivered (September 11, 1990, or September 20, 1990, or later) means that, at this stage, the Milestone Start Date is a chimera.

Subsequent sections establish financing and licensing milestones:

(c) **Financing Penalty Milestone.** In the event that Service Company has failed to execute the construction loan to finance the complete construction of the System ("Construction Financing Date") by the later of

(i) twenty (20) months following the Milestone Start Date, or

(ii) two months following the Project License Date, where the Project License Date shall mean the date on which Service Company has obtained the last of the permits, approvals, licenses and authorizations conventionally required prior to the construction financing of the System (provided, however, that this clause (ii) shall apply only if Service Company has prudently filed for and diligently pursued the processing of such permits, approvals, licenses and authorizations),

Service Company shall make penalty payments to Customer accrued on a weekly basis and payable monthly in arrears at a rate equal to $2,000 per week.

Except as set forth herein, such obligation to make penalty payments shall be Customer's exclusive remedy for Service Company's failure to achieve this Financing Penalty Milestone; provided, however, that any failure of Service Company to make such payments, which continues without cure for a period of thirty (30) days after written notice from the Customer of such failure, shall create an option for Customer to terminate this Agreement, upon the exercise of which this Agreement shall become null and void without further force or effect.

(d) **Financing Termination Milestone.** In the event that the Construction Financing Date has not occurred by the later of (i) twenty-four (24) months following the Milestone Start Date or (ii) six (6) months following the Project License Date, or such later date as may be extended hereunder, Customer shall have an option to terminate this Agreement, upon the exercise of which this Agreement shall become null and void without further force or effect. In the event that the later such date described hereinabove is six (6) months following the Project License Date, Service Company shall be entitled to such later milestone date hereunder only if at the earlier date of twenty-four (24) months after the Milestone Start Date, Service Company shall have executed the gas purchase agreement for the fuel for the System and the power sales agreement for the electrical output from the System.

(e) **Project License Termination Milestone.**
Notwithstanding anything hereinabove in Section 5.2(b) which may be to the contrary, including the possible pendency of an appeal of any license or permit denial, in the event that the Project License Date has not occurred by the end of the thirtieth month (30th) month after the Milestone Start Date, as such may be extended hereunder, Customer shall have an option to terminate this Agreement, upon the exercise of which this Agreement shall become null and void without further force or effect.

According to § 5.3(a), as each milestone passed, UCP had a duty to inform the Board whether that element of the agreement had been fulfilled, and if not, how long it would take to remedy the situation. There is no evidence that such notice was ever given; apparently, neither the Board nor UCP noticed that their clocks were set to different times. Section 5.3(b) establishes a termination procedure, by which the Board (or URI) could

give notice of termination, effective contemporaneous therewith, for a milestone failure by telephone, confirmed in writing with an overnight express mailing, at any

time after the passage of any original or extended milestone deadline for which an option to terminate is applicable[.]

As provided in § 5.2, the ESA's *force majeure* clause provides for relief from the harsh strictures of the termination and penalty milestones:

### Section 21: Force Majeure

As used in this Agreement, "Force Majeure" means causes beyond the reasonable control of and without the fault or negligence of the party claiming Force Majeure. If either Party shall be unable to carry out any of its obligations under this Agreement due to events beyond the reasonable control of and without the fault or negligence of the party claiming Force Majeure—including, but not limited to an act of God; sabotage; accidents; appropriation or diversion of steam energy, equipment, materials or commodities by rule or order of any governmental or judicial authority having jurisdiction thereof; any changes in applicable laws or regulations affecting performance; war; blockage; insurrection; riot; labor dispute; labor or material shortage; fuel storage; fire; explosion; flood; nuclear emergency; epidemic; landslide; lightning; earthquake or similar catastrophic occurrence—this Agreement shall remain in effect, but the affected Party's obligations shall be suspended for the period the affected Party is unable to perform because of the disabling circumstances provided that:

(a) the non-performing party gives the other Party prompt written notice describing the particulars of the Force Majeure including, but not limited to, the nature of the occurrence and its expected duration, and continues to furnish timely reports during the period of Force Majeure;

(b) the suspension of performance be of no greater scope and of no longer duration than is required by the Force Majeure; and

(c) no obligations of either Party that arose before the Force Majeure causing the suspension of performance be excused as a result of the Force Majeure.

(d) the non-performing Party uses its best efforts to remedy its inability to perform.

Economic hardship, including any lack of appropriations, will not constitute Force Majeure.

Section 21 was not intended to provide absolute relief from a party's contractual duties. Instead, the affected party could, upon notice, suspend performance of any obligations rendered impossible by the *force majeure* event, for as long as the situation continued.

The last section of the ESA addresses zoning, the issue that had vexed the Board and UCP throughout the negotiations. "Addresses," however, does not mean resolve; the decision whether to seek approval from the South Kingstown Zoning Board was left squarely with UCP, with the caveat that the Board and URI were not waiving their historical immunity:

### Section 42: Zoning

(1). Service Company agrees that not later than thirty (30) days after the execution of this Agreement, it shall inform Customer in writing *whether (i) it will undertake to obtain any local zoning approval for the construction and operation of the System; or (ii) it is able to secure construction and permanent loan financing for the System irrespective of any state or local law or ordinance concerning zoning.*

(2). In the event that Service Company decides to undertake obtaining such local zoning approvals, it shall do the following:

(a) It shall petition the Town Council of the Town of South Kingston [sic] to amend Article 11 "Public Zoning Districts" of its Zoning Ordinance to add the following section:

"Section 1102—Lease for Electric and/or Steam Generating Facility

Notwithstanding any other provision of this Article 11, any land in a Public Zoning District (P) may be leased to a for-profit, non-governmental firm, person or legal entity for use as a commercial electric and/or steam generating facility ... provided, however, that such use shall be permitted in a Public Zoning District (P) upon the grant of a special exception therefor by the Zoning Board of Review pursuant to this Ordinance."

\* \* \* \* \* \*

(b) In the event that the foregoing amendment is duly adopted by said Town Council, Service Company shall submit an application to said Zoning Board of Review to obtain the required special exception.

(3). The parties hereto agree that it is not the intention of either of them that any amendment to said Zoning Ordinance or the obtainment by Service Company of any such special exception be construed or interpreted in any manner to constitute (i) a waiver by Customer of any of its rights under said Zoning Ordinance or (ii) an admission that said Zoning Ordinance applies in any respect to Customer.

(Emphasis added; additional subsections omitted.) Exhibit I to the ESA, incorporated into the contract "as though fully set forth at length wherever so referenced," § 1, lists zoning approval from the Town of South Kingstown as one "required prior to financing of system," Exhibit I § II, though not as an application required under § 5.2(a).

On October 1, 1990, William F. Quinn, president of Meridian Kingston Corp., notified the Board and URI that, pursuant to ESA § 42(1), UCP would seek to obtain local zoning approvals for the construction and operation of the plant. On December 11, 1990, Quinn petitioned the South Kingstown Town Council to amend the town Zoning Ordinance as specified in ESA § 42. Once the amendment was adopted, UCP would then apply to the Zoning Board for a special exception, which would presumably be granted.

With that fateful step, UCP abandoned the sure path and milestones of the ESA, and sank into a regulatory and jurisdictional quagmire. Casting the issue as a zoning dispute masks what actually occurred: South Kingstown used the petition to force consideration of a broad array of environmental and aesthetic concerns. Ignoring UCP's pleas, the South Kingstown Town Council tarried over the matter for the next two years.

During this time, UCP pursued the gas purchase agreement and the power sales agreement required by ESA § 5.2(d). By October 1, 1992, UCP had an executed gas purchase contract. Deposition of William F. Quinn at 99. As to the power sales, New England Power ("NEP") had accepted UCP's offer to sell it a 28 megawatt entitlement in January 1989, and by October 1, 1992 UCP and NEP had completed, though not executed, a final power sales agreement. Affidavit of William F. Quinn (January 18, 1995) at ¶¶ 4–7. Similarly, Eastern Edison Co. ("EECo") had accepted UCP's bid in June 1992 and by October 1, 1992 the two companies had drafted a standard form of power sales agreement, though they had not signed it. *Id.* at ¶¶ 8–10.

At no time—neither before October 1, 1992 nor after—did UCP execute a construction loan to finance the building of the facility. Quinn Deposition at 100–101. By December 1992, UCP's inability to convince the South Kingstown Town Council to amend its Zoning Ordinance—which, as feared, made financing dicey—threatened to sink the project forever. On September 18, 1992, Meridian Kingston Corp. and Meridian Power Corp. (KPA's general and limited partners, respectively), had entered into an agreement with CU Energy Partnership, L.P., a Delaware limited partnership, to form URI Cogeneration Partners, L.P., a new Rhode Island limited partnership.[2] UCP's general partners would be CUE Kingston Corp., a Delaware corporation with p.p.b. in New York, and Meridian Power of Kingston Corp., a Massachusetts corporation with p.p.b. in Boston. (Meridian Kingston and Meridian Power of Kingston are the same entity.) Meridian Power Corp. would be a limited partner. On February 19, 1993 (effective December 31, 1992), the ESA was amended to reflect KPA's assignment of all its rights and duties to UCP. For all intents and purposes, nothing else about the ESA was altered. Section 1 of the amendment states:

Except as expressly provided herein, the Energy Services Agreement shall remain and is in full force and effect.

2. Strictly speaking, KPA was the Service Company until this point, and the Court's use of UCP is a misnomer. However, the parties have adopted the habit of referring to the Service Company as UCP at all times, and to avoid confusion, the Court follows suit.

On January 6, 1993, the Rhode Island Department of Environmental Management ("RI–DEM") sent a letter to UCP stating that all necessary pre-construction permits and approvals had been granted and that, under the applicable regulations, the project had "commenced." Nevertheless, the zoning issue was still a pox on the enterprise. The South Kingstown Town Council met on March 8, 1993 and resolved *not* to support an amendment to the Zoning Ordinance. During the days before and after this rejection of UCP's petition, Commissioner Americo W. Petrocelli ("Petrocelli"), representing the Board, President Robert L. Carothers ("Carothers") of URI, and URI's general counsel, Mary E. Kennard ("Kennard"), met to discuss the status of the project. On March 11, 1993, Kennard notified UCP that, effective March 12, 1993, the ESA and Lease were terminated. In part, the letter stated:

> In reviewing the project milestones under the Energy Services Agreement (ESA), the Service Company has missed the Project License Termination Milestone described in Section 5.2(e) because Meridian has been unable to obtain its project license and construction financing without zoning approval. Additionally, the power sales agreements required for extension of the Permit Progress Milestone in 5.2(b) and Financing Milestone in 5.2(d) have not been fully executed.

Soon thereafter, UCP brought suit in this Court, alleging multiple counts of breach of contract, tortious interference with contract, and equitable estoppel. The Board promptly countersued for damages and penalties arising out of UCP's alleged failure to meet several different milestones. The Board then moved for summary judgment under Fed.R.Civ.P. 56(c) as to all claims, although the thrust of the Board's argument turned on the validity of UCP's termination under ESA § 5.2(e), the Project License Termination Milestone. After hearing oral argument on September 15, 1994, the Court denied the motion, ruling that uncertainty over the Milestone Start Date (which determined whether March 12, 1993 was truly the thirty month mark) created factual issues that could only be resolved at trial.

Pursuant to Fed.R.Civ.P. 56(d), the Board then moved for clarification of the Court's denial of summary judgment. The Board argues that, *inter alia*, (i) Kennard's termination of UCP was authorized; (ii) the Board was entitled to terminate UCP pursuant to ESA § 5.2(d), the Financing Termination Milestone, and that ESA § 5.2(c), the Financing Penalty Milestone, does not affect the Board's rights under ESA § 5.2(d); (iii) the February 19, 1993 amendment to the ESA did not waive the Board's accrued termination rights; (iv) the *force majeure* clause does not relieve UCP of its obligations under the ESA; (v) UCP may not seek indirect, special or consequential damages; and (vi) UCP's claim for tortious interference with contract must fail as a matter of law. Additionally, the Board presses its considerable counterclaim. UCP disputes every element of the Board's motion.

The Court heard oral argument on the Board's Rule 56(d) motion on January 4, 1995. The parties subsequently submitted supplemental memoranda and pretrial statements. After wading through the deluge of briefs, affidavits and documentary evidence, the Court is now prepared to issue a Rule 56(d) order.

## II. Standard of Review and Applicable Law

### A. Rule 56(d) Standard

■ Fed.R.Civ.P. 56(d) states:

**Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just.

Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Commonly referred to as "partial summary judgment," Fed.R.Civ.P. 56, Advisory Committee Notes, 1946 Amendment, the rule provides a procedural device whereby the Court may salvage much labor from a denial of summary judgment, narrowing the factual issues for trial. *See Rivera–Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 747–749 (1st Cir.1995).

■ The standard for ruling on a Rule 56(d) motion is identical to that deployed when considering a summary judgment motion under Rule 56(c). *Flanders + Medeiros Inc. v. Bogosian*, 868 F.Supp. 412, 415–417 (D.R.I.1994), *aff'd in part, rev'd in part*, 65 F.3d 198 (1st Cir.1995); *Costello, Erdlen & Co. v. Winslow, King, Richards & Co.*, 797 F.Supp. 1054, 1060–1061 (D.Mass.1992). Rule 56(c) dictates that summary judgment shall be granted if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Court must view the facts and all inferences therefrom in the light most favorable to the non-moving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). In determining whether a factual dispute is genuine, the Court must decide whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the suit under the applicable law. *Costello, Erdlen*, 797 F.Supp. at 1061. In order to win summary judgment, the moving party must show that "there is an absence of evidence to support" the nonmoving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The non-moving party, of course, may not rest in its trenches but must "set forth specific facts demonstrating that there is a genuine issue for trial." *Oliver v. Digi-*

*tal Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988).

■ The Court's power in issuing a Rule 56(d) order extends beyond a mere recitation of disputed and undisputed facts; in order to distill the issues to be tried, the Court may bar certain legal arguments and affirmative defenses if it is clear that they run counter to the governing law. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2737, at 462–463 (1983).

## B. Jurisdiction and Applicable Law

■ The Court has subject matter jurisdiction over this litigation pursuant to 28 U.S.C. § 1332(a)(1), the federal diversity statute. "[F]or purposes of diversity jurisdiction, a limited partnership is a citizen of every state of which its general or limited partners are citizens." *Halleran v. Hoffman*, 966 F.2d 45, 47 (1st Cir.1992) (citing *Carden v. Arkoma Assoc.*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990)). UCP is therefore a citizen of Massachusetts, New York, and Delaware; KPA is a citizen of Massachusetts. The Rhode Island Board of Governors for Higher Education is a Rhode Island public corporation organized pursuant to R.I.Gen.Laws §§ 16–59–1 to –23 (1988); the University of Rhode Island is operated and controlled by the Board under R.I.Gen. Laws §§ 16–32–1 to –29 (1988). *See URI v. A.W. Chesterton Co.*, 2 F.3d 1200, 1211 (1st Cir.1993) (The Board and URI not an arm of the State and thus a citizen of Rhode Island for diversity purposes). Hence, complete diversity of citizenship exists among the parties. The amount in controversy exceeds $50,000 by a wide margin.

■ The Court, sitting in diversity jurisdiction, must apply the law of Rhode Island, the forum state, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), including Rhode Island's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 491, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Section 38 of the ESA states that the contract will be governed by Rhode Island law. As the agreement was negotiated in Rhode Is-

land, and intended to be executed there, the Court is convinced that a Rhode Island court would accept the parties' choice-of-law provision under both the *lex loci contractus* doctrine and an interest-weighing analysis, *see Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 5–6 (1st Cir.1994) (survey of Rhode Island's choice of law rules). Thus, the Court will forego a complicated analysis and declare ESA § 38 to be valid. *See also Bird v. Centennial Ins. Co.*, 11 F.3d 228, 231 n. 5 (1st Cir.1993) (independent analysis of contractual choice-of-law provision not necessary when there was a "reasonable relation" between dispute and forum whose law was selected).

## III. Analysis

### A. Count I: The Board's Ratification of Kennard's Actions

■ Count I of the Complaint alleges that URI and the Board breached the ESA by virtue of URI's "improper and unilateral termination" of the contract. Mary Kennard, URI's general counsel, fired UCP by letter, effective March 12, 1993. Essentially, UCP argues that Kennard's (and thus URI's) termination of UCP was an *ultra vires* act, and thus, somehow, a breach of the contract.[3] UCP maintains, first, that Kennard (and URI) lacked the authority to terminate the ESA unilaterally, without prior approval by the Board. Second, UCP argues that any Board approval (or ratification) of Kennard's actions needed a formal vote—just as the Board had voted its approval of the ESA when it was signed in September 1990. The Board responds that, even assuming that Kennard lacked prior authorization, the Board ratified her actions through its subsequent actions and the maintenance of a counterclaim in this suit. Moreover, that ratification was valid. The Court agrees with the Board, and grants summary judgment to defendants as to Count I.

As a preliminary matter, the Court struggles to find that Kennard's actions were unauthorized. In the days prior to March 12, 1993, Kennard met with URI President Car-

others and Commissioner Petrocelli, the Board's representative, and discussed UCP's progress and the prospect of termination. However, even assuming *arguendo* that Kennard acted unilaterally, under Rhode Island law, the Board ratified her actions.

■ The doctrine of ratification (or affirmance), long recognized by the Supreme Court of Rhode Island, holds that a principal may consent to the acts of an unauthorized agent and thus be bound. *Beckwith v. Rhode Island School of Design*, 122 R.I. 93, 404 A.2d 480, 485 (1979); *Sabourin v. LBC, Inc.*, 731 F.Supp. 1145, 1150 (D.R.I.1990) (applying Rhode Island law of agency). For ratification to occur, a principal such as the Board must have full knowledge of all the material facts. *Beckwith*, 404 A.2d at 485. Here, it is uncontroverted that the Board either knew of Kennard's letter beforehand or was informed of UCP's termination shortly afterward.

■ The ratification of an unauthorized agent's actions may be express or implied. *Newport Oil Corp. v. Viti Bros., Inc.*, 454 A.2d 706, 707–708 (R.I.1983). The standard is notably loose: "Affirmance or ratification may be established by any conduct of the purported principal manifesting that he consents to be a party to the transaction or by conduct, justifiable only if there is ratification." *Id.* at 708 (citing *Restatement (Second) of Agency* § 93, at 240 (1957)) (hereinafter, *Restatement (Agency)*). Indicia of ratification include the retention of a benefit to which the principal would have no other claim, *id.*, and the maintenance of a suit on the basis of the agent's actions. *Restatement (Agency)* § 97, at 250.

Indicia of the Board's consent to be bound by Kennard's actions is as plentiful as sand on a beach. The Board has strenuously maintained, for nearly three years, that it intends to retain the benefits of UCP's termination. Moreover, by defending themselves and URI against this suit, and by filing a counterclaim, the Board has resoundingly af-

---

**3.** The Board raises the common-sense point that UCP should not have accepted Kennard's letter if they truly believed that she was acting beyond

her powers. While Rhode Island law renders this point moot, it is an interesting question.

firmed Kennard's firing of UCP, for good or ill.

Nevertheless, UCP responds that, absent an official vote of the Board, any subsequent ratification of the Kennard letter is invalid. UCP cites *Restatement (Agency)* § 93(2), which states that "[w]here formalities are requisite for the authorization of an act, its affirmance must be by the same formalities." According to UCP, since the entire Board formally voted to authorize the ESA, a second vote was required to terminate it.

UCP's argument flies in the face of the *Restatement (Agency)*, Rhode Island law, and the express language of the ESA. First, the "formalities" referred to in the *Restatement (Agency)* are the common-law devices of seals and writings, not a Board meeting. *Restatement (Agency)* § 93, Comment b, at 241; *Restatement (Agency)* § 28, Comment a, at 107. Section 93(2) may have relevance to the application of the Statute of Frauds, but not here. Second, R.I.Gen.Laws § 16–59–15 (1988) mandates that a Court must construe the powers of the Board, enumerated in that Title and Chapter, "liberally in aid of [the chapter's] declared purposes." The Court will not attempt to curb the Board's exercise of its powers by forcing procedural requirements on it. The Board has provided ample evidence of its ratification of UCP's termination; the Court will not quibble with the means it chose to do so.

And third, Kennard's firing of UCP by letter, effective the next day, complied with the procedure established by ESA § 5.3(b). That section contains no mention of any Board vote; rather, it sets forth a very simple mechanism by which the "Customer"— defined in ESA § 1 as the Board *and* URI— can end the project. When the Board voted initially to authorize the ESA, it approved the ESA § 5.3(b) procedure, thus erasing any need for a second, termination vote. UCP agreed to the section when it signed the contract, and it cannot seek refuge in legalisms to alter the terms of its own bargain.

The Court finds, as a matter of fact and law, that the Board ratified Kennard's March 12, 1993 termination of UCP. Therefore, summary judgment is granted to defendants as to Count I of the Complaint.

## B. Counts II to V and VII to IX: Breach of Contract and Equitable Estoppel

### 1. Interpretation of the ESA

"Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility." *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989). Under Rhode Island law, a court's objective in construing contractual language is to determine the parties' intent. *Johnson v. Western Nat. Life Ins. Co.*, 641 A.2d 47, 48 (R.I.1994). As a first step, the court must determine whether the contract's terms are clear or ambiguous as a matter of law. *Kelly v. Tillotson–Pearson, Inc.*, 840 F.Supp. 935, 944 (D.R.I.1994). "To be sure, the actual meaning of a contractual provision which can reasonably accommodate two or more interpretations should be left to the jury. But the question whether a provision can reasonably support a proffered interpretation is a legal one, to be decided by the court." *Fleet National Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 556 (1st Cir.1995) (citations omitted).

In assessing the claimed ambiguity of a contractual term, the court must view the agreement in its entirety, giving its terms their plain, ordinary, and usual meaning. *Johnson*, 641 A.2d at 48. Only if the contract is "reasonably and clearly susceptible to more than one interpretation" is it ambiguous. *W.P. Associates v. Forcier*, 637 A.2d 353, 356 (R.I.1994). If only one interpretation is reasonable, the contract is deemed unambiguous and the intent of the parties as it is clearly expressed governs according to the plain meaning of the contractual terms. *Id.*

This Court will then enforce clear contractual terms as they are written. *Kelly*, 840 F.Supp. at 944; *Textron, Inc. v. Aetna Cas. & Sur. Co.*, 638 A.2d 537, 539 (R.I.1994). What legal effect the agreement's terms must have is a question of law for the Court, *Hodor v. United Services Auto. Ass'n*, 637 A.2d 357, 359 (R.I.1994); the parties's intent, as inferred from the overall contract, governs

the Court's legal analysis. *Hill v. M.S. Alper & Son, Inc.*, 256 A.2d 10, 15 (R.I.1969).

As a prelude to what follows, the Court states that the terms of the ESA are clear and unambiguous, and that the interpretations set forth below will govern at trial.

### 2. Determination of the Milestone Start Date (MSD) as Defined in ESA § 5.2(a)

■ In denying the Board's September 15, 1993 motion for summary judgment, the Court stated that conflicting evidence as to when the MSD occurred created a triable issue of fact. Nothing provided to the Court since then has answered the question. As laid out in the Court's review of the background facts, *supra*, UCP has submitted evidence that the MSD was September 20 or October 1, 1990; the Board has offered September 11, 1990 as the date. The Court therefore preserves the factual determination of what day counts as the MSD for trial.

### 3. Necessary Permits and Approvals Under ESA § 5.2(a)

■ Zoning approval was not a necessary permit under ESA § 5.2(a). Exhibit I § I, fully incorporated into the contract through ESA § 1, lists those "applications which must be filed pursuant to Section 5.2(a)." The subsection does not mention zoning; instead, zoning approval is listed under § II, "Permits and approvals required prior to financing of system." Yet even there zoning is treated as optional, as subject to UCP's choice under ESA § 42 to pursue it.[4]

■ The Board has alleged, in its Pretrial Memorandum, that termination under ESA § 5.2(a) was authorized because UCP did not file for Coastal Resource Management Council approval as required by that section. As this argument was made nowhere in the Board's earlier memoranda, no evidence is provided to the Court, and UCP has had no opportunity to respond, the Court will refrain from considering the issue.

For the purposes of trial, the Court finds that (i) zoning approval was not a required

permit under ESA § 5.2(a) and (ii) whether UCP fulfilled its contractual obligations under that section is an unresolved issue of fact.

### 4. Termination and Penalties Under ESA § 5.2(c)

By the terms of ESA § 5.2(c), the Financing Penalty Milestone, UCP's failure "to execute the construction loan" to pay for the facility's construction within a certain period of time leads to financial penalties. UCP had a duty to execute the loan by the *later* of "(i) twenty months following the Milestone Start Date" or "(ii) two months following the Project License Date" ("PLD"); the PLD is defined as "the date on which [UCP] has obtained the last of the permits, approvals, licenses, and authorizations *conventionally required prior to the construction financing of the System.*" *Id.* (emphasis added). In turn, subsection (ii) applies only if UCP has "prudently filed for and diligently pursued" the necessary permits and approvals. The penalties are set at $2,000 per week; UCP's failure to make the payments for thirty days after written notice from the Board gives the Board an option to terminate.

■ Continued dispute over ESA § 5.2(d), the next section, and its relation to ESA § 5.2(c) forces the Court to pause by this milestone. The purpose of ESA § 5.2(c) was to establish financial *penalties* for UCP's tardiness; it was not a termination milestone *per se*. It is uncontroverted that UCP never executed a construction loan. The question, then, is whether the Court, without a trial, can apply the language of ESA § 5.2(c) to the facts as they now stand.

The short answer is, no. Viewing the evidence in the light most favorable to UCP, the Court is unable to determine whether UCP "prudently filed for and diligently pursued" the necessary permits and approvals. The parties have submitted documents detailing UCP's attempts to persuade the South Kingstown Town Council to amend the Zoning Ordinance. But as to the other permits

---

4. The parties have devoted little energy to whether or not zoning approval was a necessary permit under ESA § 5.2(a). The Court makes this finding only as a preliminary step towards application of the ESA's *force majeure* clause in part III.C, *infra*.

and approvals, the evidence is silent. Therefore, the Court cannot determine whether UCP merited the second, later milestone of ESA § 5.2(c)(ii).

Moreover, UCP contends that the January 6, 1993 RI–DEM commencement letter proves that, as of that day, UCP had obtained all the necessary permits for financing and construction. Hence, by UCP's reckoning, January 6, 1993 was the Project License Date. (UCP clearly hopes that the Court will infer from the RI–DEM letter that it was diligent in pursuing the approvals, and thus deserving of the later milestone.) According to UCP, two months later, on March 6, 1993, the Financing Penalty Milestone occurred—but UCP never paid anything, as the partnership was terminated before they could reach for their checkbooks.

The argument contains one major flaw. ESA § 5.2(c)(ii) defines the PLD as the day the last of the permits required prior to construction *financing* are obtained. Financing and construction are two different beasts. According to ESA §§ 1 (incorporating Exhibit I § II) and 42, zoning approval is required prior to financing—and it is undisputed that the South Kingstown authorities never gave their benediction to the project. Therefore, it is unclear whether the RI–DEM letter—which addresses construction only—could mark the day of the PLD. Giving UCP the benefit of all doubt, the Court finds that whether or not the PLD ever occurred *by the terms of ESA § 5.2(c)(ii)* is an open question of fact. Once that riddle is solved, the Court will be able to determine whether penalties were due, and if so, the amount.

The Court finds that (i) the lack of evidence prevents the Court from determining whether UCP was sufficiently ardent in its pursuit of the pre-financing permits to merit the *later* penalty milestone under ESA § 5.2(c)(ii) and (ii) whether the PLD occurred (and if so, when) must be determined at trial.

*5. Termination Under ESA § 5.2(d)*

The Board's motion for clarification, despite being a melange of arguments great and small, can be purified to one proposition.

The Board contends that, even accepting October 1, 1990 as the Milestone Start Date, the termination of UCP on March 12, 1993 was authorized by ESA § 5.2(d), the Financing Termination Milestone. Viewing the facts in the light most beneficial to UCP, the Court declines to grant summary judgment to the Board on the basis of ESA § 5.2(d). Although the Court accepts the Board's reading of the section, the application of ESA § 5.2(d) to the facts at hand invokes the doctrine of substantial performance—thus raising factual questions that must be reserved for trial.

The Financing Termination Milestone of ESA § 5.2(d) states that if the Construction Financing Date ("CFD") has not transpired by the *later* of (i) twenty-four months following the MSD or (ii) six months following the PLD or "such later date as may be extended hereunder," the Board gains an option to terminate. *Id.* (emphasis added). The section then specifies that "[i]n the event that the later such date described hereinabove is six (6) months following the [PLD], [UCP] shall be entitled to such later milestone date hereunder only if at the earlier date of twenty-four months after the [MSD]," UCP has executed a gas purchase agreement to fuel the facility and the power sales agreement to dispose of the electricity. *Id.* The Construction Financing Date is defined in ESA § 5.2(c) as the date on which UCP executed "the construction loan to finance the complete construction of" the cogeneration facility. It is undisputed that UCP never executed a construction loan; the CFD never happened.

██ In attempting to apply the language of ESA § 5.2(d) to the non-occurrence of the CFD, the Court is faced with conflicting interpretations of the section's structure. The Board argues that ESA § 5.2(d) plants two milestones: first, twenty-four months after the MSD; and second, a mark set at six months after the PLD or "such later date as may be extended hereunder." By the Board's reading, UCP was bound by the first, twenty-four month milestone *unless* the partnership had executed the gas purchase

and power sales agreements by that date; if so, the second, later milestone was available.

UCP argues that ESA § 5.2(d) establishes three milestones: first, the twenty-four month point; second, six months after the PLD; and third, "such later date" as the parties agree to or as the ESA allows. According to UCP, only the third was contingent on the partnership's execution of the power sales and gas purchase agreements. Therefore, UCP automatically qualified for the later date of six months after the PLD.

While the actual meaning of a contract clause that can support two or more reasonable readings is a jury question, the initial question of whether the clause supports the proffered interpretation is a legal one. *Fleet National Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 556 (1st Cir.1995). It is the Court's task to decide whether the alternate interpretations offered by the Board and UCP can both be derived reasonably from the wording of ESA § 5.2(d). The Court finds that UCP's reading of the section runs counter to its plain language and clear meaning, and rejects that proffered interpretation.

As recited above, the latter half of ESA § 5.2(d) dictates that if the "later such date described hereinabove is six (6) months following the [PLD]," the later date is available only if UCP has met the gas purchase and power sales conditions by the twenty-four month mark. However inelegantly phrased, the "later such date" clearly refers to subsection (ii), which sets the milestone at six months after the PLD. The Court will not fret over awkward drafting when the meaning is lucid: ESA § 5.2(d) mandates that if a milestone set six months after the PLD was later than a twenty-four month milestone, then UCP had to fulfill certain obligations to earn the later date. (Note that ESA § 5.2(c) employs the same structure, placing conditions on the later milestone.) In contrast, UCP's proffered interpretation renders much of the section useless: if the contingencies attach only when the parties agree to a milestone placed six months after the PLD, UCP could easily avoid the conditions by agreeing to any day but that one. ESA § 5.2(d) will

not bear UCP's reading of it, and the Court rejects it as a matter of law.

UCP also argues that ESA §§ 5.2(c) and 5.2(d) operate together—that UCP could avoid § 5.2(d)'s termination provisions by paying penalties due under § 5.2(c). The contract will not support this interpretation, either. ESA § 5.2(c) is a *penalty* clause; § 5.2(d) establishes *termination* points, on different dates and with different conditions attached. The two sections stand separate and apart—it is conceivable that UCP might have gained the benefit of the later penalty milestone under ESA § 5.2(c) but, because of the partnership's failure to execute the gas purchase and power sales agreements, fall victim to ESA § 5.2(d)'s twenty-four month termination point. Thus, neither section affects the other, and UCP's interpretation is rejected as a matter of law.

Acceptance of the Board's interpretation of ESA § 5.2(d), however, does not end the matter. The pivotal question in applying ESA § 5.2(d) is whether UCP executed the gas purchase and power sales agreements by October 1, 1992, thus earning the benefit of the later milestone, or whether UCP was bound by the twenty-four month milestone of § 5.2(d)(i). If so, the Board's March 12, 1993 termination of UCP can be seen as the exercise of a six-month-old option.

By October 1, 1992, UCP had executed a gas purchase contract; the Board offers no evidence to rebut this fact. As to power sales agreement(s), the record is less clear. The Board argues that UCP had not *executed* the power sales contracts by that date; UCP concedes that none were signed. Yet UCP offers evidence that New England Power and Eastern Edison had both accepted the partnership's offers by October 1, 1992, and that the power sales agreements were complete and ready for signing.

Without fully articulating it, UCP has made a substantial performance argument. As incorporated into Rhode Island law, the doctrine of substantial performance shields contracting parties from the harsh effects of being held to the letter of their agreements. Instead, substantial fulfillment

of an obligation by one party suffices to trigger a corresponding duty on behalf of the other party. (Put simply, a showing by UCP that it substantially "executed" the gas purchase and power sales agreements would force the Board to give UCP the benefit of the later milestone.) As the First Circuit has stated:

> The doctrine of substantial performance 'is one that has played a part in the enforcement of contracts and in the statement of contract law.' 3A Corbin, *Corbin on Contracts* § 700, at 308 (1960). 'When a contract has been made for an agreed exchange of two performances, one of which is to be rendered first, the rendition of one substantially in full is a constructive condition precedent to the duty of the other party to render his part of the exchange.' *Id.* at 309.

*Russell v. Salve Regina College,* 938 F.2d 315, 317 (1st Cir.1991) (applying Rhode Island law). The Rhode Island Supreme Court has applied the doctrine to construction contracts, *DiMario v. Heeks,* 351 A.2d 837, 838–839 (R.I.1976), although there is "no evidence that the Rhode Island Supreme Court has evinced a particularly begrudging attitude toward the doctrine[.]" *Russell,* 938 F.2d at 318. Given that the ESA is a form of construction contract, the Court is convinced that the Rhode Island Supreme Court would apply the doctrine in this case.

■■■ "Whether there has been substantial performance is a question of fact for the jury to resolve relying on all the relevant evidence." *National Chain Co. v. Campbell,* 487 A.2d 132, 135 (R.I.1985). The Board has shown that no power sales agreements were executed by October 1, 1992; UCP has demonstrated that it had negotiated and drafted two power sales contracts by that date. Whether that amounts to substantial performance of the conditions established in ESA § 5.2(d), thus earning UCP the right to pursue financing for six months after the PLD, is a question of fact that will be resolved at trial.

The Court finds that (i) the Construction Financing Date never occurred; (ii) ESA § 5.2(d) provides for two possible Financing Termination Milestones, the first set at twen-ty-four months after the MSD, and the second at six months after the PLD; (iii) the second, later milestone was available to UCP only if the partnership had executed gas purchase and power sales agreements at the twenty-four month mark; (iv) whether UCP substantially performed that condition by negotiating and drafting power sales agreements with New England Power and Eastern Edison is a triable question of fact; and (v) ESA §§ 5.2(c) and 5.2(d) operate independently of each other—the payment of penalties under the first does not extend any termination deadlines under the second.

### 6. Waiver of Penalty and Termination Milestones

■■■ Count VIII of the Complaint seeks damages on the basis of equitable estoppel. UCP alleges that the Board waived any and all penalty and termination milestones that occurred prior to December 31, 1992 when it agreed to the February 19, 1993 amendment of the ESA. According to this view, UCP detrimentally relied on the Board's alleged waiver of its termination and penalty rights, to its harm.

■■■ As defined by the Rhode Island Supreme Court, "waiver is the voluntary intentional relinquishment of a known right. It results from action or nonaction[.]" *Pacheco v. Nationwide Mutual Insurance Co.,* 337 A.2d 240, 242 (R.I.1975). "A party's actions can resolve the question of whether he or she has knowledge of the right waived and whether the waiver was voluntary." *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.,* 488 A.2d 723, 725 (R.I.1985). More specifically, "[c]ontractual rights may be waived by conduct inconsistent with the express terms of the agreement." *Violet v. Travelers Express Co., Inc.,* 502 A.2d 347, 349 (R.I.1985). "As a general rule, the question of whether a party has voluntarily relinquished a known right is one of fact for a jury." *Haxton's,* 488 A.2d at 725–26.

The Board parries UCP's thrust with § 1 of the February 1993 amendment. That section states that "[e]xcept as expressly provided herein," the ESA carries on "in full force and effect." Thus, the Board contends, § 1

preserved the ESA's milestones, including whatever termination options had accrued. The fact that the Board chose not to exercise their termination rights before the amendment is of no account.

Were the Court to satisfy itself with boilerplate reservation clauses, it might agree with the Board. But the applicable Rhode Island Supreme Court cases instruct the Court to consider the actions of UCP and the Board more generally; here, the Court finds sufficiently conflicting evidence to merit reservation of the waiver issue for trial.

Considering the facts from the Board's point of view, § 1 of the February 1993 amendment and Kennard's reference to ESA §§ 5.2(b) and 5.2(d) in her termination letter demonstrate that the Board did not intend to relinquish any previous contractual rights when UCP was substituted for KPA.

Examining the facts in the manner most favorable to UCP, however, the Court notes that during the five months prior to the amendment, the Board acted in a manner inconsistent with the terms of the ESA. Meridian Power, Meridian Kingston and CU Energy formed UCP in September 1992. Just weeks later, according to the Board, the ESA § 5.2(d) termination milestone passed. Yet the Board has not shown that the milestone was noted in any way, or that the Board informed the nascent UCP that its head was on the block. (It appears that *neither* side noted the milestone's passing.) Similarly, it has not been demonstrated that the Board sought any of the penalties it was allegedly due under ESA § 5.2(c). From UCP's point of view, the Board watched the new partnership form, amended the ESA to substitute UCP for KPA, and then summarily terminated the contract. At this stage, the Court is unable to determine whether these actions and omissions constitute affirmative waiver of the milestones—but the evidence supports both interpretations with

enough ease that the waiver issue must be tried.

The Court finds that UCP has presented sufficient evidence of waiver by the Board to merit reservation of this question for trial.

## C. The ESA's Force Majeure Clause Does Not Relieve UCP of its Obligations Under ESA §§ 5.2(c) and 5.2(d).

 UCP contends that even if the Court were to find that the partnership failed to meet the financing penalty and termination milestones of ESA §§ 5.2(c) and 5.2(d), UCP would nonetheless be excused from its financing obligations by operation of ESA § 21, the contract's *force majeure* clause. It is clear that UCP's inability to secure an amendment to the South Kingstown Zoning Ordinance, and thus to win zoning approval for the project, led to UCP's failure to secure financing. According to UCP, the capriciousness of the South Kingstown Town Council amounted to an event "beyond the reasonable control of and without the fault or negligence of" UCP, ESA § 21; therefore, the contract's *force majeure* clause should have (indefinitely) suspended UCP's duty to obtain financing.

The Court does not agree, and declares that, as a matter of law, the *force majeure* clause of ESA § 21 does not excuse UCP from its financing obligations under ESA §§ 5.2(c) and 5.2(d).[5] Rhode Island case law provides little guidance in analyzing ESA § 21, but the common law of excuse and *force majeure* is sufficiently clear that the Court is confident in predicting how the issue would be determined by the Rhode Island Supreme Court.

The Court of Appeals of New York has written:

[C]ontractual *force majeure* clauses—or clauses excusing nonperformance due to circumstances beyond the control of the

5. The parties have quarreled over the question of whether zoning approval was a necessary permit for the purposes of ESA § 21. As stated in part III.B.3, *supra,* the Court has found that zoning approval was not a necessary permit under ESA § 5.2(a). However, UCP bore the onus of procuring financing for the project under ESA §§ 5.2(c) and 5.2(d). Thus, UCP had an obli-

gation to apply for any permits and approvals required by the project's financiers—which means that the agreement's *force majeure* clause applied directly to the financing duty and indirectly to UCP's obligation to get zoning approval. But that is beside the point. What matters is whether UCP was excused from meeting the financing deadlines.

parties—under the common law provide a ... narrow defense. Ordinarily, only if the *force majeure* clause specifically includes the event that actually prevents a party's performance will that party be excused.

*Kel Kim Corp. v. Central Markets, Inc.,* 70 N.Y.2d 900, 524 N.Y.S.2d 384, 385, 519 N.E.2d 295, 296 (1987) (citations omitted). Nowhere does ESA § 21 list "failure to obtain zoning approval" among the parade of horribles triggering the section's application. UCP responds that ESA § 21 includes a catchall phrase specifying that events of *force majeure* are "not limited to" the mentioned calamities, and that *any* "[c]auses beyond the reasonable control of" (and occurring without the fault of) UCP suffice.

In *Kel Kim,* the New York Court Appeals wrote that "[t]he principle of interpretation applicable to [catchall] clauses is that the general words are not to be given expansive meaning; they are confined to things of the same kind or nature as the particular matter mentioned." 524 N.Y.S.2d at 385–386, 519 N.E.2d at 296–297 (citing 18 Williston, *Contracts* § 1968, at 209 (3d ed. 1978)). Applying the same canon of interpretation to the present matter, the Court declines to extend ESA § 21 to cover zoning defeats.

What distinguishes the Biblical plagues described in ESA § 21 from a failure to procure zoning permission is the question of foreseeability. As the Board points out, *force majeure* clauses have traditionally applied to unforeseen circumstances—typhoons, citizens run amok, Hannibal and his elephants at the gates—with the result that the Court will extend ESA § 21 only to those situations that were demonstrably unforeseeable at the time of contracting. More specifically, only if the actions of the South Kingstown Town Council were beyond the realm of imagination in September 1990 would the law of *force majeure* apply. *See In the Matter of A & S Transportation Co. v. County of Nassau,* 154 A.D.2d 456, 546 N.Y.S.2d 109, 111 (1989) ("[T]he law of impossibility provides that performance of a contract will be excused if such performance is rendered impossible by intervening governmental activities,

but only if those activities are unforeseeable.")

Zoning was an issue long before the ESA was signed. UCP and the Board negotiated for two years before the contract was struck, and it is undisputed that the parties bickered over whether South Kingstown had zoning and regulatory jurisdiction, whether zoning approval was necessary for financing, and how UCP might seek such permission without the Board waiving its historical immunity. In addition, after the April 4, 1990 community meeting, everyone knew that the townsfolk were turning against the project and that environmental debates loomed. Thus it was foreseeable that the South Kingstown Town Council would prove less pliable than UCP hoped, that zoning approval would be denied, and that the parties would have to cope with the consequences. Hence, failure to win zoning permission was a foreseeable event, unlike the catastrophes listed in ESA § 21, and not of the nature and kind commonly excused by *force majeure* clauses. UCP and the Board could have provided for this eventuality—instead, they left everything in UCP's hands.

 Which raises the issue of who, under the ESA, bore the risk that zoning would be denied. Under the common law, "if governmental approval is required for a party's performance, the party may be taken to assume the risk that approval will be denied if there is no provision excusing the party in that event." 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 9.6, at 554–55 (1990) (footnotes omitted); *see also* 6 Corbin, *Corbin on Contracts,* § 1347, at 435 (1962 & Supp.1994) ("Ordinarily, when one contracts to render a performance for which a government license or permit is required, it is his duty to get the license or permit so he can perform. The risk of inability to obtain it is on him; and its refusal by the government is no defense in a suit for breach of his contract.") (footnotes omitted); *Security Sewage Equipment Co. v. McFerren,* 14 Ohio St.2d 251, 237 N.E.2d 898 (Ohio 1968) (contractor bore risk that department of health would reject plans for construction of sewage treatment plant). UCP undertook the chore of obtaining financing; ESA § 42 expressly

permitted UCP to seek zoning approval (and notify the Board) *if* the partnership decided that financing would be unavailable without it. The decision was entirely UCP's—under ESA § 42(1)(ii), the partnership could have notified the Board that "it is able to secure construction and permanent loan financing for the system irrespective of any state or local law or ordinance concerning zoning." It follows that UCP, having chosen to seek an amendment to the zoning code, bore the risk that the South Kingstown Town Council would refuse to make the change. UCP made performance of their financing obligations contingent upon approval by the South Kingstown authorities; hence, the hazard that approval would not be forthcoming, and that performance would be impossible, was theirs.

The Court finds that, as a matter of law, ESA § 21 does not suspend or excuse UCP's financing duties under the contract.

### D. Remedies Under ESA §§ 18.1 and 18.2.

Sections 18.1 and 18.2 of the ESA preclude both the Board and UCP from obtaining indirect, special or consequential damages. In pertinent part, ESA § 18.1 states that "[n]otwithstanding anything in this Agreement which may be to the contrary, in no event shall Customer [the Board] be liable for any indirect, special or consequential damages." The section then provides for a number of remedies "[u]pon the occurrence of an Event of Material Default by Customer." *Id.* Keeping things fair, ESA § 18.2 dictates that "in no event shall Service Company [UCP] be liable for any indirect, special or consequential damages." No interpretive gloss is necessary.

Nevertheless, UCP argues that the prohibitions of ESA § 18.1 do not apply in this suit. It reads the remedies provision of ESA § 18.1 as limited to cases where the Board has committed an event of material default

as defined in ESA § 17.1. Listing the various events described in that section, including termination "of this Agreement in breach of its obligations under this Agreement," ESA § 17.1(f), UCP declares that the Board has committed none of them. Thus, it is free to pursue special, indirect and consequential damages.

■ UCP stops one move short of checkmating itself. The remaining Counts in this matter allege that the Board terminated the ESA in breach of its terms—precisely the event foreseen in ESA § 17.1(f). If the Court so finds, then ESA § 18.1 will govern the Board's liability. Only if the Court *did not* grant summary judgment to defendants on Counts I, VI, and VII would this argument have any purpose.[6]

As a matter of fact and law, neither UCP nor the Board may seek special, indirect or consequential damages in this matter.

### E. Counts VI and VII: Tortious Interference With Contract

■ Counts VI and VII allege that URI tortiously interfered with the contractual relations between itself, the Board and UCP. Count VI seeks damages on the grounds that by improperly terminating UCP, URI sought to "delay, defeat or alter the Project." Count VII claims that URI withdrew its support of UCP during the zoning fight, causing UCP's petition to be denied, with resulting damages.

The Board counters that under Rhode Island law, the tort of interference with contractual relations applies only to parties outside the contract. URI, as party to the ESA, cannot be found liable under the tort. For the reasons stated below, the Court agrees, and grants summary judgment to defendants on Counts VI and VII.

---

6. The Board contends that UCP's statement is a binding admission of fact, "functionally equivalent to the 'admissions on file' expressly recognized by Rule 56(c)." Defendants' Supplemental Memorandum in Support of Motion for Summary Judgment at 30. Were that true, UCP would have conceded the day and this matter would be at end. But determination of whether

the Board is in breach is a legal question to be answered by the Court, after applying the facts as developed at trial. Only the Court has the power to make that ruling. UCP's statements are legal suppositions advanced by counsel; they are not binding on the parties and have no evidentiary weight.

Under Rhode Island law, "intentional and malicious interference with a contractual relationship is actionable." *Smith Dev. Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 308 A.2d 477, 480 (1973). "Malice," for the purposes of the tort, is defined as any unjustified interference. *Id.* To prevail, the plaintiff must prove "(1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with the contract; and (4) that the plaintiff suffered damages as a result of defendant's interference." *New England Housing v. Rhode Island*, 893 F.Supp. 1180, 1192 (D.R.I.1995). Once the plaintiff has proven the four elements, the burden shifts to the defendant to justify its actions. *Id.*

The question raised by UCP's claims, however, is *who* can bring suit under the tort. The archetypal case arises when a defendant interferes with a contract between a plaintiff and a third party, usually by inducing the third party to breach. *New England Housing*, 893 F.Supp. at 1192. Rarely does a court face a situation where a defendant stands accused of interfering with its own agreement.

Nevertheless, Rhode Island law is clear on the issue, and UCP's claims are barred. In *Jolicoeur Furniture Co., Inc. v. Baldelli*, 653 A.2d 740 (R.I.1995), the Rhode Island Supreme Court faced the question of whether the mayor of the City of Woonsocket and another city official could be sued for tortiously interfering with a contract between Woonsocket and the plaintiffs. The defendants argued that "there had been no third-party interference with the contract between the city of Woonsocket and plaintiffs because [the mayor and the official] were not third parties and had not acted outside the scope of their authority." *Id.* at 752.

The Court accepted as given the proposition that tortious interference with contract applies only to parties *outside* the agreement, noting that liability is imposed on defendants who interfere with "the plaintiff's rights under a contract with *another person* [.]" *Jolicoeur*, 653 A.2d at 752 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129, at 978 (5th ed. 1984) (emphasis in original)). "The question,

therefore, is whether [the mayor, the official,] and the City of Woonsocket can be considered the same party." *Id.* Only after the Court had deemed the defendants to be sufficiently separate from the city to be third parties did it sustain the plaintiffs' verdict. *Id.* at 752–753.

By the rule of *Jolicoeur*, suits brought under the Rhode Island law for tortious interference with contract can only be maintained against non-contractual third parties. Hence, the Court finds that URI may not be subjected to suit for tortious interference with its own contract. The Court grants summary judgment to defendants on Counts VI and VII of the Complaint.

## F. The Board's Counterclaim

Resolution of the Board's counterclaim for damages and financial penalties arising out of UCP's alleged inability to meet the various penalty and termination milestones turns on the same questions of chronology, substantial performance and waiver already discussed in this Opinion. The Court denies defendants summary judgment on the counterclaim, and reserves consideration of UCP's alleged contractual liability until after the facts are developed at trial.

## IV. Conclusion

For the foregoing reasons, the defendants' motion for clarification pursuant to Fed. R.Civ.P. 56(d) is granted. This matter will be set down for trial in the near future. The findings of fact and determinations of law contained in this Opinion and Order resolve the applicable issues and the parties will direct their evidence at trial toward resolution of the factual questions set forth above.

In addition, summary judgment is granted to defendants on Counts I, VI, and VII of the Complaint.

It is so ordered.