404 A.2d 480.

HENRY L. P. BECKWITH, JR. *vs.* RHODE ISLAND SCHOOL OF DESIGN.

JULY 30, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

94

DORIS, J. This is a civil action brought by the plaintiff Henry L. P. Beckwith, Jr., to recover damages for breach of contract. At the conclusion of the plaintiff's direct case, a trial justice of the Superior Court directed a verdict for the defendant on all counts. Judgment was entered accordingly, from which the plaintiff appeals. For reasons set forth herein, we affirm.

Henry Beckwith first became employed by defendant Rhode Island School of Design (RISD) during the 1964-65 school year. During that year and each of the following academic years up to 1968-69, Beckwith was employed as a full-time instructor under a series of one-year contracts.

In July, 1969, Beckwith entered into a three-year contract as an assistant professor in the graphic design department. At about the same time, RISD, through its Board of Trustees, adopted a "permanent plan for appointment and tenure" (the plan). The plan governed all subsequent appointments with the intention that it would instill uniformity into RISD's hiring practices and insure adequate notice of contract renewal or nonrenewal.

There were two distinct features of the plan. First, it provided that "[t]he sequence for making recommendations for appointment, termination of appointment, or tenure shall move from the Department Head, to the Division Chairman, to the Committee on Faculty Appointments (hereinafter referred to as the CFA)."[1] Secondly, the plan divided the various types of teaching appointments into six categories lettered A to F. The categories ranged from one-year appointments (category A), to tenure appointments (category D), to nonfaculty teaching appointments (category F).

Beckwith's three-year contract, beginning in 1969, was in category B. Category B, a category for new professors, provided for the possibility of two successive three-year appointments. At the end of the first three-year appointment, the plan provided that:

> "* * * the offer of a new appointment at a rank not less than Assistant Professor or notification that no new appointment will be offered or the offer of a position in Category F must be given to the appointee before December 15 in the third year of his appointment."

On December 7, 1971, the third year of Beckwith's three-year contract, Beckwith received notice from his department head, Thomas Sgouros, that he was recommending nonrenewal of Beckwith's contract.[2] This recommendation

[1]This committee was originally referred to as the "President's Advisory Committee."

[2]Sgouros was also serving as the chairman of the design division at this time.

was duly submitted to the CFA. The CFA rejected the recommendation, however, allegedly because Sgouros lacked experience in the graphic design department, and instructed Sgouros that any further recommendation would require the unanimous endorsement of the faculty of the graphics department.

Eventually, Sgouros and the department faculty agreed to "offer" Beckwith a one-year appointment as an "Adjunct Professor"—a position without faculty voting rights. According to Beckwith, Sgouros individually, and the department faculty as a whole, told him that at the end of this trial year, he would either get a three-year contract or his employment would be terminated, the decision to depend on his performance. Beckwith testified that he agreed to this arrangement because "[i]t was better than being fired."

At the conclusion of the trial period, however, Sgouros recommended only a one-year contract as a professor with full-faculty status, rather than the three-year contract, notwithstanding the fact that Beckwith's performance during the trial period had been approved. Sgouros submitted this recommendation to the CFA on three separate occasions. Each time the CFA rejected the recommendation as "inappropriate" because it "did not conform to the Plan."

Finally, on March 16, 1973, Sgouros changed his recommendation and recommended that Beckwith's employment be terminated. The CFA voted to accept this recommendation and the president of RISD, Talbot Rantoul, notified Beckwith on March 30, 1973 that his contract would not be renewed.

On April 13, 1973, an "appeal" hearing was held before President Rantoul, Associate Dean Merlin Szosz of the School of Design, and the CFA. Beckwith appeared and was heard. At the conclusion of the hearing, the CFA voted on and passed the following motion:

> "In accordance with the procedures set up within the operation of the Committee on Faculty Appointment,

that allow a hearing after a decision has been made at all levels, this Committee has held that hearing and has considered the strong statements by the students, the faculty, and alumni and the strong statements made by Henry L. P. Beckwith, Jr. and has VOTED to set aside the previous recommendation."

President Rantoul allegedly told the CFA that he would "go along with this decision." On April 27, however, Rantoul informed Beckwith that his contract would not be renewed.

At the close of plaintiff's direct case, defendant moved for a directed verdict. Granting the motion, the trial justice concluded that the evidence considered in a light most favorable to plaintiff was insufficient to support the allegations of contract breach in plaintiff's complaint. In this appeal the overall thrust of plaintiff's argument is that the trial justice misconceived the evidence and failed to consider it in a light most favorable to plaintiff as required under the directed-verdict standard. *See, e.g., Fontaine* v. *Devonis,* 114 R.I. 541, 543-44, 336 A.2d 847, 850-51 (1975).

We first address the assertion that the offer of a one-year adjunct position breached plaintiff's contract rights under the plan. Because plaintiff was a professor in the third year of an initial three-year contract under category B, RISD could do one of three things: it could terminate his employment; it could renew his contract for a second three-year term; or it could offer him a contract as a category F employee. According to plaintiff, RISD did none of these. Instead, RISD offered him an adjunct professorship, which position plaintiff strenuously contends is not a category F position. Therefore, he reasons in substance that, since he was not fired and was not offered a category F appointment, a jury could conclude that the adjunct contract was actually the first year of a second three-year contract under category B.

We disagree. At the outset we note that a determination of what rights devolved from plaintiff's contract with RISD was a question of law for the court to decide. Only when disputed issues of fact concerning the terms of a contract exist, should

a jury become involved with questions relating to the legal effect of a written instrument. *See Richardson* v. *Greensboro Warehouse & Storage Co.*, 223 N.C. 344, 345-46, 26 S.E.2d 897, 898 (1943); *State Bank of Wilbur* v. *Phillips*, 11 Wash. 2d 483, 489, 119 P.2d 664, 666 (1941); *Verdi* v. *Helper State Bank*, 57 Utah 502, 510, 196 P. 225, 228 (1921). *See generally* Annot., 65 A.L.R. 648 (1930). In the case *sub judice* the essential facts were undisputed, and, in any event, the trial justice in applying the directed-verdict standard was obliged to construe the facts in a light most favorable to plaintiff. Thus, the issue was preeminently a question of law.

Turning now to the merits of plaintiff's argument, we agree that the position of adjunct professor does not fit precisely within the plan's description of category F employees, *viz*:

> "* * * those associated with Rhode Island School of Design in special services such as part-time instructors, lecturers, critics, for those engaged in special research projects, and for non-teaching positions such as supervisors of laboratories, type workshops, wood working shops, etc."

Nevertheless, the minutes of various CFA meetings indicate that adjunct professor appointments were quite common.[3] And both the introductory remarks and the contents of the plan clearly exhibit an intention that the plan encompass within its various categories all of the teaching positions at the school. The plaintiff admits that when he assumed the adjunct position he lost his vote as a faculty member, which fact is consistent with the nonfaculty status of a category F position. Thus, notwithstanding its somewhat *sui generis* character, we think that the trial justice was correct in concluding that the adjunct position was in category F. Moreover, even assuming that the adjunct position was not in category F, it would require contractual alchemy to change,

---

[3]For example, plaintiff's exhibit 12 (CFA minutes of December 11, 1972) indicates that thirteen adjunct appointments were made in the division of architectural studies for the second semester of the 1972-73 academic year.

as plaintiff would have us do, the one-year adjunct position with no faculty vote, into a three-year position with full faculty status under category B. Nothing in the record supports such an anomalous result.

The plaintiff argues in the alternative that even if the adjunct position were in catgegory F, he was not *offered* this position before December 15, 1971, as required by the notice provisions of category B. This point is well taken. Not until March 31, 1972, did President Rantoul officially offer the position to plaintiff by letter. However, although we agree with plaintiff that the offer was not timely, we part company with plaintiff concerning the ramifications of late notice. The plaintiff contends that under category B, failure to give timely notice of nonrenewal automatically triggered renewal of his contract for three years. He reaches this conclusion by reasoning that the notice provisions of the plan establish a contractually enforceable "expectation of re-employment." Our short answer to this contention, however, is that his expectation of employment was fulfilled, albeit in category F. The plaintiff was well aware by December 15, 1971, that both his department head and the CFA were not going to recommend a three-year renewal. There is nothing in the record justifying an exclusive expectation of continued employment under category B as opposed to employment under category F.

Moreover, there is no evidence of a college policy that, absent timely notice, renewal was automatic. *Decker* v. *Worcester Junior College*, 369 Mass. 960, 961, 336 N.E.2d 909, 910 (1975); *cf. Ferguson* v. *Thomas*, 430 F.2d 852, 856 (5th Cir. 1970); *Green* v. *Howard University*, 412 F.2d 1128, 1134-35 (D.C. Cir. 1969). Accordingly, we find plaintiff's claim of a justifiable expectation of continued employment to be without merit.

The next argument advanced by plaintiff concerns an oral promise allegedly made by his department head, Thomas Sgouros. Considering the evidence most favorably to plaintiff, the record indicates that Sgouros promised plaintiff

a three-year contract upon the successful completion of the one-year trial period as an adjunct professor, plaintiff would be given a three-year contract. The plaintiff contends that this promise is enforceable against defendant RISD. We think not.

The record is devoid of evidence that Sgouros had the authority—actual or apparent, to bind RISD in contract. Under the plan the authority granted to department heads is clearly advisory. Hence we find no discernible basis for plaintiff's claim that this document conferred actual authority. Nor is there any indication that RISD cloaked Sgouros with apparent authority. Between the years 1965 to 1972, plaintiff received seven separate letters of appointment from RISD. Each letter was signed by the president of RISD on behalf of the Board of Trustees. Each letter, which included the terms of employment, was signed on the line marked "accepted" and returned to the office of the president. This evidence reveals that plaintiff was well aware of who the contracting agents for the school were. There is no indication that his department head had ever been involved in the employment process other than in an advisory fashion.

Similarly, we can find nothing in the record to indicate that the RISD administration ratified the promise made by Sgouros. Under the law of agency, a principal may consent to the acts of an unauthorized agent and be bound under the principle of ratification. *See* Seavy, *Agency* §32 (1964). Before ratification can occur, however, the principal must have full knowledge of all material facts.

In this case plaintiff points to various documents indicating that the president and the CFA knew of the trial-period arrangement with plaintiff. But there is not a scintilla of evidence that they were aware that plaintiff had been promised a three-year contract upon successful completion of this trial period. Nor can this *quid pro quo* be fairly inferred. At best, an inference might be drawn that the president and the CFA were aware that Sgouros had promised to *recommend* a three-year contract.

The plaintiff further argues that the vote of the CFA on April 13, 1973, "setting aside" their previous recommendation for nonrenewal of plaintiff's contract, amounted to a decision to renew plaintiff's contract. According to plaintiff, the CFA sat as an "appeals body" with final authority concerning renewal of plaintiff's contract. In support of this contention, he maintains that the Board of Trustees, through the plan, delegated ultimate hiring authority to the CFA. Therefore, he contends, the president lacked authority to reverse, as he did in this case, the renewal decision of the CFA.

This syllogism cannot withstand analysis. In the first place, we do not agree that the plan grants contractual authority to the CFA. Under the plan the function of the CFA is clearly advisory. The plan includes the CFA in the "sequence" of recommendations for appointment or termination. Indeed, the language of various CFA meeting minutes is indicative of their advisory function. For example, the minutes of March 15, 1973, state that "upon recommendation" from the various department heads, the CFA "voted to *recommend* the reappointment of Mr. Marzynski * * * to *recommend* the reappointment of Mr. Barnes * * * to *recommend* the reappointment of Mr. Lawing," and "to *recommend* the reappointment of Mrs. Marcoux." (Emphasis added.) Similar language is used in the minutes of the meeting of December 15, 1971, where the CFA "VOTED to *recommend* the appointment of Mr. Beckwith as Adjunct Professor of Graphic Design for the academic year 1972-73." (Emphasis added.) We see no reason why the word "recommend" as used in the plan should be interpreted to mean anything other than its customary meaning. As one court has noted, "[a] recommendation is not an act of final decisive power—it merely suggests the desirability of a course of action to be followed by another." *Mora County Board of Education* v. *Valdez,* 61 N.M. 361, 366, 300 P.2d 943, 946 (1956); *see Ingard* v. *Barker,* 27 Idaho 124, 136-39, 147 P. 293, 297 (1915).

The construction given to the plan by plaintiff would render reference to the president superfluous since he is not in the sequence of recommendation and, according to plaintiff, is not vested with decision-making authority. This interpretation also conflicts with the express authority conferred on the president by the corporate bylaws. Through these bylaws, the Board of Trustees delegates to the president the power "to execute all duly authorized deeds, conveyances, leases, transfers, discharges, agreements, contracts, and other documents, instruments and obligations of the corporation * * *." Our review of the record discloses nothing to indicate that the board intended by the adoption of the plan to denude the president of authority to execute contracts, paticularly employment contracts.

Moreover, even if the plan confers final decisional power to an "appeals body," that so-called body, according to the facial language of the plan, is not the CFA alone. Rather, the plan states that should the CFA or the president reject a recommendation concerning employment a hearing will be held "attended by the President, the [CFA], and the Department Head or Division Chairman involved." Thus, under a literal reading of the plan, the CFA is but one component of the so-called appeals body.

Furthermore, again assuming that the CFA served the appellate function plaintiff ascribes to it and that it had the authority to renew plaintiff's contract, we do not agree that the CFA exercised that authority in this case. Because the CFA voted to "set aside" its previous *recommendation* for nonrenewal, it does not follow that the CFA was per force deciding to renew plaintiff's contract. Indeed, immediately following the recordation of the "set aside" vote, the CFA minutes state:

> "It was noted that the case of Mr. Beckwith would again have to be resolved were his appeal granted. This should be made clear to the faculty involved and to Mr. Beckwith. If he is rehired and in two years the Department Head feels Mr. Beckwith is not functioning well as a teacher, there will be no alternative but non-renewal of his contract."

This language is not consistent with plaintiff's claim that the "set aside" vote itself resulted in automatic renewal of his contract. Likewise, the testimony of Dean Szosz, a participant at the meeting at which the "set aside" vote was taken, is at odds with the argument advanced by plaintiff. In response to questioning by plaintiff's counsel, Dean Szosz testified as follows:

"Q Did you know what the previous vote of the committee was?

"A I believe that a majority of those on the committee had voted to support the recommendation for non-renewal, but it was not a unanimous vote at that time.

"Q So that the effect of this vote was to reverse that previous decision so that there would be a renewal of the contract?

"A No. It rescinded all votes. Those in favor and those against the motion. Therefore, it seemed to me the sentiment of the committee was that they negated a vote one way or the other."

We also reject plaintiff's claim that a jury should decide whether the CFA vote resulted in a renewal of plaintiff's contract. Since the essential facts were not in dispute, it was the duty of the court to determine the legal effect of that vote. *See Associated Tabulating Services, Inc.* v. *Olympic Life Insurance Co.,* 414 F.2d 1306, 1310 (5th Cir. 1969); *United States* v. *O. Frank Heinz Construction Co.,* 300 F. Supp. 396, 399 (S.D. Ill. 1969); *Cortland Asbestos Products, Inc.* v. *J & K Plumbing & Heating Co.,* 33 App. Div. 2d 11, 12, 304 N.Y.S.2d 694, 696 (1969).

We have carefully studied the remaining arguments briefed by the plaintiff and find them without merit and warranting no further discussion in this opinion.

The plaintiff's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

*Milton Stanzler*, for plaintiff.

*Peter J. McGinn, Steven Snow*, for defendant.