[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is the Motion for Summary Judgment of Defendant Fleet National Bank (Fleet) as to Counts X, XI, and XII of the Amended Verified Complaint.[1]
 FACTS/TRAVEL
In his Last Will and Testament, Alfred T. Ciccone (A. Ciccone) created a trust (Trust) naming Elsie M. Ciccone (E. Ciccone), his wife, lifetime beneficiary and Richard Ciccone (R. Ciccone), his son, an attorney, trustee and residuary beneficiary. As a lifetime beneficiary, E. Ciccone received the interest income of the Trust. (R. Ciccone Aff. ¶ 15.) Deposits of this interest, made bi-annually, were, as a matter of course, less than $10,000 in amount. (Id.)
Shortly after A. Ciccone's death on December 18, 1980, R. Ciccone hired Defendant Robert A. Pitassi (Pitassi), an attorney and relative, to handle the financial and legal affairs of the Trust. In his capacity as lawyer for the Trust, Pitassi helped to prepare tax returns, monitored Trust funds, and made recommendations as to the investment of Trust funds. (R. Ciccone Aff. ¶ 3.)
On March 2, 1993, R. Ciccone opened a certificate of deposit (CD) account (Account), bearing account number 8032942031, with Fleet. The "Certificate of Deposit Receipt" (CD Receipt) lists the "depositor" as "Trust Under the Will of Alfred T. Ciccone" and the depositor's address as: c/o Robert A. Pitassi, Esq., 850 Fleet Center, Providence, RI 02903. The CD Receipt indicates that $95,000, the sum deposited, "will be paid to the listed depositor[s]" and, that in the absence of contrary instructions, the "deposit will be automatically renewed for the same term at the rate in effect on the maturity date." The CD Receipt further states: "[t]his is a Time Deposit Receipt which is non-negotiable and non-transferable."
In addition, Fleet's "Deposit Account Agreement for Personal Accounts" (Deposit Account Agreement) references CDs held by trusts. It states:
 "[i]ndividuals and unincorporated non-business associations may open and maintain personal Checking and Savings Accounts, and CDs and Jumbo CDs. Personal trusts . . . may also maintain these Accounts. . . .
 Deposits may be made by one or two persons in trust for another (the "beneficiary"). Any action in connection with the Account, including withdrawals, may be made only by the trustee or, if there are two trustees, by both or either trustee or the survivor." Deposit Account Agreement at 10.
On January 30, 1997, Fleet addressed a "Certificate of Deposit Pre-Renewal Notice" (Pre-Renewal Notice) to Richard A. Ciccone, Trustee for "TRT U/W/O Alfred T[.] Ciccone," c/o Robert A. Pitassi, Esq., 850 Fleet Center, Providence, RI 02903. The Pre-Renewal Notice provides: "[y]our Fleet Certificate of Deposit will automatically renew on the maturity date indicated below. . . . If you wish to make changes [to the account], please complete and return this form within 10 days following your Maturity Date. Otherwise, your certificate will renew as explained above."
Thereafter, Pitassi called Diane Becton (Becton), a "Senior Relationship Administrator" at Fleet, provided her with the CD Account number, informed her that the CD would mature in March, and said that he needed a cashier's check made out to the Trust. (Becton Tr. at 8.) Pitassi also completed and returned to Fleet the Pre-Renewal Notice. On the Pre-Renewal Notice, Pitassi wrote, "Please make cashier's check payable to Trustee on 3/3/97. Do not rollover. Thank you, R.A. Pitassi, Attorney for the Trustee, 2/6/97." Furthermore, in the first signature blank below the statement "[w]e authorize Fleet Bank to carry out the options selected on this form," Pitassi signed "Robert A. Pitassi, Attorney for Richard A. Ciccone, Trustee."
The CD matured on March 2, 1997. On March 3, 1997, Becton requested the cashier's check. That same day, Fleet issued a cashier's check (Fleet Cashier's Check), check number 96655119, for $99,533.69 and made payable to "Richard A. Ciccone Trustee for TRT U/W/O Alfred T. Ciccone." Becton then called Pitassi and informed him that the Fleet Cashier's Check was ready for pick-up at the front desk with the receptionist. (Becton Tr. at 18.)[2]
Once in possession of the Fleet Cashier's Check, Pitassi wrote on the back of it: "for deposit only to the account of Richard A. Ciccone, Trustee for TRT U/W/O Alfred T. Ciccone[,] #003-396777.11." (R. Ciccone Aff. ¶ 17.) Pitassi then deposited the Fleet Cashier's Check at Hospital Trust in NOW account number 003-396777 (Hospital Trust Checking Account). The Hospital Trust Checking Account was in the name of Richard A. Ciccone, Trustee under the will of Alfred T. Ciccone, and under the address 45 Enfield Avenue, Providence, RI 02904.[3] Hospital TrustStatement at 1. Hospital Trust provided R. Ciccone with monthly statements concerning the Hospital Trust Checking Account. (Ferro Aff. ¶ 10.)
On or about March 4, 1997, Pitassi told E. Ciccone that he was re-investing the proceeds from the CD, Amended VerifiedComplaint at 4, and E. Ciccone gave Pitassi a check for $95,000 drawn on the Hospital Trust Checking Account (Check Number 356). Elsie Ciccone made Check Number 365 payable to "Robert A. Pitassi, Attorney for Richard A. Ciccone, Trustee" and signed it "Richard A. Ciccone, Trustee [by] Elsie M. Ciccone P.O.A." Pitassi endorsed and cashed Check Number 356 on March 4, 1997.
On or about March 10, 1997, a second check was drawn on the Hospital Trust Checking Account for $4,533.69 (Check Number 357). Check Number 357, representing the interest income from the CD Account, was made payable and paid to E. Ciccone.[4]
Also on or about March 10, Hospital Trust provided R. Ciccone with a statement noting the $99,533.69 deposit, Check Number 356 for $95,000, and Check Number 357 for $4,533.69. (Ferro Aff. ¶ 14; Hospital Trust Statement at 1.) The two checks accompanied the statement. (Ferro Aff. ¶ 14.)
With Check Number 356's proceeds, Pitassi purchased a cashier's check from Hospital Trust, designated check number 46607139 (Hospital Trust Cashier's Check). The Hospital Trust Cashier's Check, dated March 4, 1997 and in the amount of $95,000, was made payable to "Robert A. Pitassi, Attorney for Trustee Richard Ciccone." Pitassi then deposited the Hospital Trust Cashier's Check into his client account, account number 9392195169, at Fleet. After March 10, 1997, Hospital Trust no longer possessed any of the Fleet Cashier's Check proceeds. (Ferro Aff. ¶ 15.)
In or about March of 1997, Pitassi gave E. Ciccone a document entitled "Table of U.S. Treasury Bill and other investments by Richard A. Ciccone, Trustee U/W Alfred T. Ciccone as of March 5, 1997." The table states that "$95,000 [was] used to purchase [the] face amount of $95,000 of U.S. Treasury Bills maturing March 5, 1998." In reality, however, Pitassi personally utilized and dissipated the $95,000.[5] On July 15, 1997, R. Ciccone sent Pitassi a letter authorizing Pitassi to release to R. Ciccone's accountant "any and all information including notes, records, tax returns, bank statements, receipts of investment and any other information identifying the assets, or the location of such assets if not in your possession."
In August of 1997, R. Ciccone and E. Ciccone (collectively, Plaintiffs) initiated this lawsuit, seeking to recover from Fleet and Hospital Trust for Pitassi's alleged wrongdoing. In the Amended Verified Complaint, R. Ciccone asserts several claims, including: Counts VIII and IX (breach of contract against Fleet); Count X (negligence of Fleet); Count XI (conversion of Hospital Trust) and Count XII (negligence of Hospital Trust).
Fleet filed a motion for summary judgment as to Counts VIII, IX, and X in November of 1999. Associate Justice Hurst of the Superior Court denied the motion on February 22, 2000. Furthermore, in February of 2001, R. Ciccone filed a motion for summary judgment as to Counts VIII, IX, and XI. Justice Hurst granted the motion as to Counts VIII and IX on July 24, 2001. In August of 2001, this case was assigned to the Business Calendar.
Fleet now moves for summary judgment as to Counts X, XI, and XII. Plaintiffs object to Fleet's motion.
 STANDARD OF REVIEW
In a summary judgment proceeding, the moving party must demonstrate that he or she is entitled to judgment as a matter of law and that no genuine issues of material fact exist.Palmisciano v. Burrillville Racing Ass'n, 603 A.2d 317, 320 (R.I. 1992); Super. R. Civ. P. Rule 56(c). During such a proceeding, "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Palmisciano, 603 A.2d at 320. Moreover, "the trial justice must look for factual issues, not determine them" as the judge's sole function is to determine whether any issues involving material fact exist. Steinberg v. State,427 A.2d 338, 340 (R.I. 1981).
"When an examination of pleadings, affidavits, admissions, answers to interrogatories and other similar matters, viewed in a light most favorable to the party opposing the motion, reveals no such issue, the suit is ripe for summary judgment." IndustrialNat'l Bank v. Peloso, 121 R.I. 305, 307, 397 A.2d 1312, 1313 (R.I. 1979). In opposing the summary judgment motion, the nonmoving party will not be allowed to rely upon mere allegations or denials in his or her pleadings. Bourg v. Bristol Boat Co.,705 A.2d 969, 971 (R.I. 1998); Super. R. Civ. P. 56(e). Instead, by affidavits or otherwise, the nonmoving party possesses an affirmative duty to set forth specific facts demonstrating the existence of a genuine issue of material fact. Id. It is not, however, an absolute requirement that the nonmoving party file an affidavit in opposition to the motion. Steinberg, 427 A.2d at 340. Rather, if the moving party's affidavit does not establish the absence of a material factual issue, the trial justice should deny the motion despite the nonmoving party's failure to file a counter-affidavit. Id.
 FLEET'S MOTION FOR SUMMARY JUDGMENT
I. Count X-Negligence Against Fleet
In Count X of their Amended Verified Complaint, Plaintiffs allege that Fleet (1) possessed a duty of reasonable care with respect to the CD Account funds and (2) acted negligently and failed to exercise reasonable care in (a) issuing the Fleet Cashier's Check payable to the trustee, without instruction from R. Ciccone to do so; (b) delivering the Fleet Cashier's Check, payable to "Richard A. Ciccone Trustee for TRT U/W/O Alfred T. Ciccone," to Pitassi, without signatory or other authority from R. Ciccone to do so; and (c) paying on the Fleet Cashier's Check, without R. Ciccone's proper indorsement. Amended VerifiedComplaint at 21-22. In connection with Count X, R. Ciccone, in his capacity as trustee, demands judgment against Fleet for compensatory damages in the amount of $95,000, plus interests and costs, and for such other relief as the Court deems appropriate.Id. at 22.
Fleet urges this Court to grant summary judgment as to Count X on the grounds that the allegations of fact supporting Count X and Counts VIII[6] and IX[7] for breach of contract, as well as the relief asked for in each of these counts,[8]
are virtually identical. In essence, Fleet argues that the economic loss doctrine precludes Plaintiffs' negligence claim. Plaintiffs, however, assert that Fleet has misstated the law and mischaracterized their negligence claim.
The economic loss doctrine precludes a plaintiff "from recovering purely economic losses in a negligence cause of action." Boston Inv. Property No. 1 State v. E.W. Burman, Inc.,658 A.2d 515, 517 (R.I. 1995).[9] In other words, according to the doctrine, "a plaintiff who suffers only monetary injury as a result of the conduct of another cannot recover those losses in tort"; rather, he or she "is limited to recovery under the law of contract." Reeder R. Fox et al., "Riding the Choppy Waters of East River: Economic Loss Doctrine Ten Years Later," 64 Def. Couns. J. 260, 260 (1997).
The economic loss doctrine originated in the products liability arena. Amanda K. Esquibel, "The Economic Loss Rule and Fiduciary Duty Claims: Nothing Stricter than the Morals of the Marketplace?", 42 Vill. L. Rev. 789, 791 (1997). However, to varying degrees, jurisdictions have extended the doctrine to other contexts. See generally id. at 796-838; Fox, supra,
at 260-70.
Courts of different jurisdictions have adopted divergent views concerning the applicability of the economic loss doctrine to the provision of services. Fox, supra, at 267. Compare Cargill,Inc. v. Boag Cold Storage Warehouse, 71 F.3d 545, 550 (6th Cir. 1995) (stating that the economic loss doctrine "is associated with `transactions in goods,' and not with transactions in services"); Congregation of the Passion, Holy Cross Province v.Touche Ross Co., 636 N.E.2d 503, 515 (Ill. 1994) (finding the economic loss doctrine inapplicable to tort claim in accountant malpractice action); and Collins v. Reynard, 607 N.E.2d 1185, 1186 (Ill. 1992) (declining to apply the economic loss doctrine to tort claim in legal malpractice suit) with Bristol-MyersSquibb, Indus. Div. v. Delta Star, 206 A.D.2d 177, 181 (N.Y. App. Div. 1994) (stating that "the economic loss rule serves to limit the liability of providers of services as well as providers of products").
The applicability of the economic loss doctrine to a particular factual scenario constitutes a question of law. Ins. Co. of N.Am. v. Cease Elec., Inc., 674 N.W.2d 886, 892 (Wis. Ct. App. 2003); Prent Corp. v. Martek Holdings, Inc., 618 N.W.2d 201, 204 (Wis. Ct. App. 2000); Grynberg v. Questar Pipeline Co.,70 P.3d 1, 10 (Utah 2003). In deciding whether the economic loss doctrine applies in the context of a particular service, the Illinois Supreme Court has adopted the following rule:
 "the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client. Where his duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." Congregation of the Passion, 636 N.E.2d at 515.
Applying this rule, the Illinois Supreme Court held that the economic loss doctrine did not bar recovery in tort for accountant malpractice because an accountant possesses a "duty to observe reasonable professional competence [that] exists independently of any contract." Id. In reaching this decision, the court considered that: (1) accountants make numerous decisions independent of their clients and the contracts they execute with their clients; (2) a client expects from an accountant knowledge and expertise independent of the accountant's contractual responsibilities; and (3) dissimilar to the relationship between an architect and client, but similar to the relationship between an attorney and client, the relationship between an accountant and client results in an intangible product. Id.
Whether a duty exists in a specific case presents, in the first instance, a question of law for the motion justice. Santucci v.Citizens Bank of R.I., 799 A.2d 254, 256 (R.I. 2002). Seealso Volpe v. Fleet Nat'l Bank, 710 A.2d 661, 663 (R.I. 1998) (stating that "[w]hether a duty of care runs from a defendant to a plaintiff is a question of law for the court to decide"). In determining whether a duty exists, the motion justice may contemplate factors such as:
 "the foreseeability and likelihood of the injury to the plaintiff, the connection between the defendant's conduct and the injury suffered, the policy of preventing future harm, and the consequences to the defendant and to the community of imposing a duty of care on the defendant with resulting liability for breach." Santucci, 799 A.2d at 257.
The Rhode Island Supreme Court has recognized a specific duty that extends from a bank to its customers. See Volpe, 710 A.2d at 663. The Court stated: "[i]t is incontrovertible that the law imposes upon the bank the duty of knowing the signature of its depositors." Id. This duty recognizes "the legal relationship between the parties, which is that of debtor and creditor." Id. Furthermore, the bank's duty originates "from its implied contract with the depositor wherein the bank promises to pay out only those funds of the depositor that he or she shall order." Id. The bank, however, does not owe a duty of care to "a noncustomer with whom it has no relationship." Id. at 664.
As the Rhode Island Supreme Court has yet to address whether the economic loss doctrine applies to preclude a negligence claim against a bank in connection with its services, this court is guided by the law of other jurisdictions. In dicta, the United States Court of Appeals for the Seventh Circuit addressed this issue. In Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank,265 F.3d 601, 618-19 (7th Cir. 2001), a company employee misappropriated certain funds from the company's bank account at Elizabeth State Bank (Bank). Mutual Service Casualty Insurance Company (Mutual), which compensated the company for its loss, sued the Bank for breach of contract. Id. at 606. On appeal, in response to the Bank's contention that Mutual's breach of contract claim was, in reality, a negligence claim barred by the economic loss doctrine, the Court stated:
 "Congregation of the Passion's rationale suggests that a bank's failure to observe ordinary care in handling its customer's transactions may support a tort claim notwithstanding . . . [the] commercial loss doctrine. As with attorneys and accountants, the law has long imposed on banks a duty of reasonable care and that duty is so entrenched that the UCC does not permit the parties to a banking contract to abandon it." Id. at 615 (emphasis added).
The Court further noted a growing trend, stating that "more recent cases from the Illinois Supreme Court suggest that a claim for economic loss may be pursued in tort as well as contract where, as here, the claim is founded on a duty of care that the law imposed on the defendant irrespective of the terms of the contract." Id. at 617.
In accordance with Elizabeth State Bank and applying the reasoning set forth in Congregation of the Passion, this Court recognizes that a duty of ordinary care extends from a bank to its customers. The relationship between a bank and its customers resembles that between accountant and client or attorney and client. In handling basic transactions, a bank makes decisions independent of its customers and the contracts it executes with its customers. Moreover, customers expect their bank to possess knowledge and expertise in addition to the bank's ability to fulfill its contractual responsibilities. Finally, the relationship between a bank and customer, unlike that between, for instance, an architect and his or her client, results in an intangible product.
As the individual who opened the CD Account and as the addressee of the Pre-Renewal Notice, R. Ciccone constituted Fleet's customer. This Court, therefore, finds that Fleet owed R. Ciccone a duty of ordinary care.[10] This duty to exercise ordinary care is not defined by the Deposit Account Agreement, CD Receipt, or the Pre-Renewal Notice; rather, it arises outside of and irrespective of any contract between R. Ciccone and Fleet. In light of this duty, this Court rules that the economic loss doctrine does not apply to preclude Plaintiffs' negligence claim against Fleet for its services. Accordingly, this Court denies Fleet's motion as to Count X, as based on the economic loss doctrine.[11]
 Wrench LLC v. Taco Bell Corp., No. 1:98-CV-45, 2003 U.S. Dist. LEXIS 7607, at *11-12 (W.D. Mich. May 1, 2003), andPerfumeria Ultra v. Miami Customs Service, Inc., 231 F. Supp.2d 1218, 1222-23 (S.D. Fla. 2002), cases upon which Fleet relies, prove consistent with this Court's result. In Wrench LLC, the United States District Court for the Western District of Michigan, Southern Division noted that a party can maintain an action for breach of contract as well as tort where "the defendant's conduct constituted a breach of duty separate and distinct from the breach of contract." Wrench LLC, 2003 U.S. Dist. LEXIS 7607, at *1-2. In other words, the court must "compare the claims and determine whether they are based upon the same duty." Id. at *9. If the claims are based upon the same duty, the plaintiff cannot maintain the tort claim; however, if they are not, "the tort claim is not barred." Id. at *9-10. In the case at bar, Plaintiffs' negligence and breach of contract claims are based upon separate duties. Plaintiffs' negligence claim is founded upon a duty of ordinary care that exists independent of any contract between Fleet and R. Ciccone. Seesupra p. 7 (discussing the allegations in support of Count X). Plaintiffs' breach of contract claim, on the other hand, rests upon duties arising from the contract concerning the CD Account.See supra p. 8, n. 7 and 8.
Perfumeria Ultra applied the rule that "[t]he purchaser of services cannot `recover purely economic loss due to the negligence arising from a breach of contract where the purchaser has not shown the commission of a tort independent of the breach itself.'" Perfumeria Ultra, 231 F. Supp.2d at 1223. Here, R. Ciccone has alleged the commission of a tort, specifically, the violation of a duty of ordinary care, that exists independently of the breach of the contract concerning the CD Account.
II. Count XI — Conversion Against Hospital Trust
Plaintiffs, in Count XI, allege that by accepting the Fleet Cashier's Check for deposit into the Hospital Trust Checking Account without R. Ciccone's proper indorsement, authorization, and/or direction, Hospital Trust converted and/or aided and abetted in converting the Fleet Cashier's Check and the proceeds from the CD. Amended Verified Complaint at 22.[12] Fleet asks this Court to grant summary judgment as to Count XI, arguing that G.L. 1956 § 6A-3-419(3)[13] bars Plaintiffs' claim.
"A bank . . . may be liable to the noncustomer payee in conversion under the Rhode Island Commercial Code." Volpe, 710 A.2d at 664, n. 5. Section 6A-3-419(1)(c) provides that "[a]n instrument is converted when . . . [i]t is paid on a forged instrument." This rule reflects the philosophy that "the bank taking an instrument under a forged indorsement has no title to it and has exercised control over the check in a manner inconsistent with the rights of the true owner." Volpe, 710 A.2d at 664, n. 5.
Nevertheless, § 6A-3-419(3) provides a depository bank with a defense to liability for conversion. Id. See alsoNorthwestern Nat'l Life Ins. Co. v. Laurel Fed. Sav. Bank,979 F. Supp. 354, 358 (D. Md. 1996) (noting that "§ 3-419(3) sets up an affirmative defense to be established by the bank"); CitizensState Bank v. Nat'l Surety Corp., 612 P.2d 70, 71 (Colo. 1980) (stating that § 6A-3-419(3)'s "purpose . . . is to create an affirmative defense which a defendant-bank may assert"). Section6A-3-419(3) provides:
 "a representative, including a depositary[14]
or collecting bank,[15] who has in good faith[16] and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his or her hands." Section 6A-3-419(3).[17]
Section 6A-3-419(3)
 "is intended to adopt the rule of decisions which has held that a representative, such as a broker or depositary bank, who deals with a negotiable instrument for his principal in good faith is not liable to the true owner for conversion of the instrument or otherwise, except that he may be compelled to turn over to the true owner the instrument itself or any proceeds of the instrument remaining in his hands." Id. at cmt. 5.
"[R]easonable commercial standards and determining whether those standards have been met under the circumstances are, in the first instance, questions of fact." Apcoa, Inc. v. FidelityNat'l Bank, 906 F.2d 610, 613 (11th Cir. 1990). See alsoCalray Gas Serv. v. Berry, 1990 N.Y. App. Div. LEXIS 16862 (N.Y. App. Div. 1990) (stating that "[w]hether or not a bank acted in a commercially reasonable manner is generally a question of fact"). However, a court may decide a § 6A-3-419(3) defense as a matter of law "where the endorsements are `so irregular on their face' as to raise questions as to their validity." Apcoa,Inc., 906 F.2d at 613.
In support of its motion, Fleet claims that (1) Hospital Trust's acceptance of the Fleet Cashier's Check for deposit into the account of the named payee accorded with reasonable commercial standards; (2) no evidence exists that Hospital Trust did not act in good faith; and (3) no proceeds of the Fleet Cashier's Check remained in Hospital Trust's hands as of the date that Plaintiffs initiated this lawsuit.
More specifically, Fleet relies upon the affidavit of Sandra A. Ferro (Ferro), a Regional Operations Manager for Sovereign Bank of New England and formerly an employee of Hospital Trust. Ferro has been continuously employed in the banking industry since December of 1983. (Ferro Aff. ¶ 4.). She testified by affidavit that "[t]he acceptance of the Fleet Check for deposit into the Hospital Trust Checking Account was consistent with Hospital Trust's policies, and also was consistent with reasonable commercial standards and general banking practices and usages." (Id. at ¶ 17.) She further swore that "[a]t all times, Hospital Trust acted in good faith in connection with the Checking Account, the deposit of the Fleet [Cashier's] Check, and the payment of Check Nos. 356 and 357 drawn on the [Hospital Trust] Checking Account." (Id. at ¶ 18.)
Conversely, Plaintiffs assert that Hospital Trust failed to act in accordance with reasonable commercial standards because (1) it accepted the Fleet Cashier's Check without obtaining or supplying R. Ciccone's proper indorsement and (2) Pitassi did not constitute a "holder" of the Fleet Cashier's Check. Plaintiffs, however, provide no admissible evidence demonstrating that Hospital Trust violated reasonable commercial standards or acted in bad faith.
This Court finds that Fleet, through Ferro's affidavit, has demonstrated the requisite elements of § 6A-3-419(3); to wit, that Hospital Trust acted in good faith and according to reasonable commercial standards. Fleet has established, therefore, that it is entitled to judgment as a matter of law and that no genuine issues of material fact exist. Plaintiffs, however, have failed, by affidavits or otherwise, to counter Ferro's affidavit or set forth specific facts demonstrating the existence of a genuine issue of material fact. Accordingly, this Court grants Fleet's motion as to Count XI, as based on §6A-3-419(3).
This Court finds Plaintiffs' reliance on Cooper v. UnionBank, 507 P.2d 609, 617 (Cal. 1973), unpersuasive. While recognizing that many courts, including the Supreme Court of California in Cooper, "have permitted the owner to sue the depositary bank directly for conversion even when the bank has apparently complied with subsection 3-419(3)," 4 William D. Hawkland et al., Uniform Commercial Code Series § 3-419:5 (2003), this Court declines to follow such reasoning. In dicta, the Rhode Island Supreme Court recognized § 6A-3-419(3) as a defense to a conversion claim. It stated that:
 "[e]ven under a theory of conversion, however, § 6A-3-419(3) provides a depository bank with a defense to liability. Specifically a depository bank that in good faith and in accordance with reasonable commercial standards deals with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in the bank's possession." Volpe, 710 A.2d 661, 664, n. 5.
In light of the Rhode Island Supreme Court's acknowledgement of this defense, and in the absence of Rhode Island authority calling for the abrogation of this defense, this Court finds no reason to disregard § 6A-3-419(3)'s plain language.[18]
III. Count XII — Negligence Against Hospital Trust
In Count XII of their Amended Verified Complaint, Plaintiffs contend that Hospital Trust (1) possessed a duty of reasonable care with respect to the Fleet Cashier's Check and (2) failed to exercise reasonable care by accepting the Fleet Cashier's Check for deposit even though Hospital Trust reasonably knew or should have known that (a) the check did not contain R. Ciccone's proper indorsement and (b) R. Ciccone had not authorized Hospital Trust to accept the check for deposit into the Hospital Trust Checking Account. Amended Verified Complaint at 23.
Fleet asks this Court to grant summary judgment as to Count XII, asserting that § 6A-3-419 displaces Plaintiffs' negligence claim, § 6A-3-419(3) bars the same, and Plaintiffs have failed to provide expert testimony concerning the standard of care or any deviations therefrom. Plaintiffs, nevertheless, assert that §6A-3-419 does not displace a negligence cause of action and that Fleet, and not Plaintiffs, bears the burden of providing expert testimony.
G.L. § 6A-1-103 "sets the general standard for displacement of the common law by the Code." Equitable Life Assurance Soc. v.Okey, 812 F.2d 906, 908 (4th Cir. 1987). It provides that "[u]nless displaced by the particular provisions of title 6A, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." Section 6A-1-103. In other words, §6A-1-103 "indicates the continued applicability to commercial contracts of all supplemental bodies of law except insofar as they are explicitly displaced by this Act." Id. at cmt. 1. Furthermore, where a statute is in derogation of the common law, a court must interpret it "as effecting no change in that law beyond what is clearly indicated in express terms or by necessary implication." Da Costa v. Rose, 70 R.I. 163, 168, 37 A.2d 794, 797 (R.I. 1944); Easton v. Fessenden, 65 R.I. 259, 262,14 A.2d 508, 510 (R.I. 1940).
The Rhode Island Supreme Court has yet to address whether §6A-3-419 displaces a negligence cause of action. A number of courts outside the jurisdiction, however, have held that it does.See, e.g., Equitable Life Assurance Soc., 812 F.2d at 909 (holding that § 3-419's coverage "and its allocation of the burden of proof of the element of due care in a way that differs from that in common law negligence demonstrate an intended displacement of the negligence cause of action"); Berthot v.Security Pac. Bank, 823 P.2d 1326, 1327 (Ariz. Ct. App. 1991) (stating that "the U.C.C. remedy and cause of action for conversion found in U.C.C. § 3-419 displaces common law theories of recovery based on the same activity" and that "a common law negligence claim may not be brought when the cause of action falls under" § 3-419); Flavor-Inn v. NCNB Nat'l Bank,424 S.E.2d 534, 536 (S.C. Ct. App. 1992) (noting that the conversion action allowed by § 36-3-419, South Carolina's virtually identical version of § 6A-3-419, "is a `particular provision' of the UCC that displaces the common law action for the negligent acceptance for deposit of a check with an unauthorized indorsement").
Finding this reasoning persuasive, this Court holds that §6A-3-419 displaces Plaintiffs' negligence claim. Accordingly, this Court grants Fleet's motion for summary judgment as to Count XII.
IV. Ratification
Lastly, Fleet urges this Court to grant summary judgment on the grounds that R. Ciccone ratified Fleet's and Hospital Trust's actions and, therefore, is "precluded from any recovery." Pls.'Mem. in Opp'n to Def.'s Summ. J. Mot. at 20.[19]
 A. Ratification By Suit Doctrine
Fleet contends that by filing suit against Hospital Trust, the depositary bank, R. Ciccone ratified Fleet's payment of the Fleet Cashier's Check, and Plaintiffs, therefore, may not recover against Fleet, the payor bank. Plaintiffs, to the contrary, assert that the ratification by suit doctrine does not here apply.
Under the ratification by suit doctrine, "suit by the payee of a check against the depositary or collecting bank ratifies the payment made by the drawee or payor bank to the depositary bank."Resh v. Connecticut Nat'l Bank, 89 F.3d 598, 600 (9th Cir. 1996). See also Cooper v. Union Bank, 507 P.2d 609, 614 (Cal. 1973) (stating that "[g]eneral bank collection theory also instructs us that the true owner, in bringing an action against a collecting bank for conversion of a check collected on a forged indorsement, is deemed to have ratified the collection of the proceeds from the payor bank"). In explaining the doctrine, the United States District Court for the Northern District of Illinois, Eastern Division stated:
 "When a payee sues a collecting bank for conversion, the payee seeks recovery of the specific proceeds of the check. But if — under the general theory just explained — those proceeds are viewed as having remained in the drawer's account, no conversion can have taken place (for, as already explained, the money turned over to the collecting bank was that of the payor bank rather than of that bank's customer).
 That dilemma can be avoided if the payee `ratifies' the collection of the proceeds from the payor bank, thus enabling the payee to sue the collecting bank for misusing the payee's money rather than someone else's (the payor bank's). And that concept has given rise to the doctrine that by the very act of bringing suit against the collecting bank for conversion, the payee does ratify the collection `and transmutes the remittance of funds by the payor bank into an authorized act for which it may debit its customer's account.'" P.M.F. Services, Inc. v. Grady, 698 F. Supp. 141, 143 (N.D. Ill. 1988).
Pursuant to this theory, a payor bank successfully raised the defense of ratification in a suit involving conversion, negligence, and payment by mistake claims where the claimant payee had already sued and settled a conversion claim with the depositary bank. Resh, 89 F.3d at 601. Similarly, the ratification by suit doctrine precluded a plaintiff's claims against the payor bank for conversion under the Uniform Commercial Code (UCC), common law conversion, and negligence, where, in an earlier action, plaintiff had sued and settled with the depository bank for conversion under the UCC, common law conversion, negligence, and unjust enrichment. Whalen v. ChaseManhattan Bank, N.A., 2000 U.S. Dist. LEXIS 17585 (S.D.N.Y. 2000). In reaching its decision, the court noted that "[t]he considerations at bar are judicial economy and fundamental fairness. It is in the interests of efficiency that all aspects of the disputed transaction are resolved in one proceeding in a court of appropriate jurisdiction." Id. The court went on to speculate:
 "I see no reason why . . . [the plaintiff] could not have proceeded against Chase [the payor bank] and First County [the depositary bank] in a single action in Connecticut or New York. Assuming . . . [the plaintiff] proved all the elements of her claim in such an action, one court would have the opportunity to sort, efficiently and fairly, through the relevant U.C.C. claims and defenses and apportion liability accordingly between Chase and First County." Id. at n. 4.
This Court finds that the ratification by suit doctrine does not apply here as Plaintiffs bring suit against Fleet and Hospital Trust in the same action. Accordingly, this Court denies Fleet's motion as based on the ratification by suit doctrine.
B. Ratification By Conduct
Fleet further argues that R. Ciccone "ratified the issuance, negotiation and payment of the Fleet [Cashier's] Check by accepting and utilizing" its proceeds. Def.'s Mem. in Supp. ofMot. for Summ. J. at 22. More specifically, Fleet relies on R. Ciccone's failure to contest the payment of Check Number 357 to E. Ciccone. Plaintiffs, however, assert that Fleet has failed to establish the elements of a ratification claim and that Fleet's argument only highlights genuine issues of material fact.
Ratification consists of "the adoption by a principal of the benefits of, as well as the liability involved in, an act done by an agent on the principal's behalf, but without the principal's authorization." 3 Am.Jur.2d Agency § 176. In other words, "[u]nder the doctrine of ratification, a principal may later approve the actions of an agent who acted without authority."Id.
Whether the facts and circumstances surrounding a transaction amount to ratification presents a question of fact. Ward v. J.Samuels Bro., 37 R.I. 438, 443, 93 A. 649, 650 (1915); Hallv. N.Y., N.H. H.R.R. CO., 27 R.I. 525, 530, 65 A. 278, 280 (1906). Furthermore, the burden of proving ratification rests with the party asserting the same. Murray v. C.N. Nelson LumberCo., 143 Mass. 250, 251, 9 N.E. 634, 637 (1887). See alsoStacom v. Wunsch, 162 A.D.2d 170, 171 (N.Y. App. Div. 1990) (stating that "ratification is an affirmative defense, which defendant has the burden of proving").
Proof of a ratification theory requires several elements. First, the principal must possess "full knowledge of all material facts." Beckwith v. Rhode Island Sch. of Design, 122 R.I. 93, 101, 404 A.2d 480, 485 (R.I. 1979). "Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them." United States v. Beebe, 180 U.S. 343, 354,21 S.Ct. 371, 375, 45 L.Ed. 563, 570 (1901). Second, the principal must accept a benefit that he or she would otherwise possess no right to retain. UST Corp. v. General Rd. Trucking Corp.,783 A.2d 931, 939 (R.I. 2001). Stated differently, the principal must receive "something to which he would not be entitled unless an act purported to be done for him were affirmed, and to which he makes no claim except through such act." Restatement (Second)Agency, § 98. See also Piscitelli v. De Felice RealEstate, 512 A.2d 117, 120 (R.I. 1986) (stating that the principal "accepts a benefit even when the act of the agent may have been unauthorized"). Finally, the principal must fail to repudiate the act at the time of receipt. Restatement (Second)Agency, § 98.
In support of its ratification argument, Fleet argues that after Pitassi deposited the Fleet Cashier's Check into the Hospital Trust Checking Account, E. Ciccone received payment for interest under the Trust. Fleet refers to R. Ciccone's deposition testimony that the $4,533.99 "represented interest, which as a trustee I gave to her" and that the distribution to his mother from the proceeds of the CD was "okay." (R. Ciccone Tr. at 62.) Fleet then asserts that the issuance, negotiation, and payment of the Fleet Cashier's Check constituted the medium through which R. Ciccone paid E. Ciccone this sum.
Plaintiffs claim that Fleet has failed to establish that R. Ciccone (1) received a benefit from E. Ciccone's receipt of Check Number 357; (2) possessed full knowledge "of Pitassi's scheme"; and (3) did not repudiate Pitassi's actions. Pls.' Mem. in Opp'nto Def.'s Summ. J. Mot. at 35. In particular, Plaintiffs draw this Court's attention to R. Ciccone's affidavit testimony in which he swears that:
 "I was not aware that the Fleet CD contract had been terminated, or that funds had been withdrawn from the Fleet CD, or that a cashier's check had been issued payable to me in the amount of $99,533.69 or that check no. 356 to Robert A. Pitassi had been issued from RIHT account number 003-396777 until July of 1997." (R. Ciccone Aff. ¶ 19.) (Internal references omitted.)
This Court finds that an issue of material fact exists as to whether R. Ciccone ratified the issuance, negotiation, and payment of the Fleet Cashier's Check. While the provision of the statement and the two checks to R. Ciccone by Hospital Trust implies that R. Ciccone possessed knowledge of the transaction, R. Ciccone's affidavit testimony suggests the contrary. This Court, therefore, denies Fleet's motion to the extent it is based on ratification of the Fleet Cashier's Check.[20]
 CONCLUSION
This Court denies Fleet's motion for summary judgment on Count X, as based on the economic loss doctrine and grants Fleet's motion, grounded in § 6A-3-419(3), as to Count XI. Furthermore, this Court holds that § 6A-3-419 displaces Plaintiffs' negligence claim and accordingly, grants Fleet's motion as to Count XII.
Additionally, this Court denies Fleet's motion as based on the ratification by suit doctrine, and having found that an issue of material facts exists as to whether R. Ciccone ratified the issuance, negotiation, and payment of the Fleet Cashier's Check, denies Fleet's motion to the extent it is founded upon ratification of the Fleet Cashier's Check.
Counsel shall present an appropriate order for entry.
[1] In or about May of 1998, Defendant Rhode Island Hospital Trust (Hospital Trust) merged with BankBoston, N.A. BankBoston N.A. then merged with Fleet. Fleet admits that "if either plaintiff proves that any act of Hospital Trust alleged in the Amended Verified Complaint creates a legal liability on the part of Hospital Trust to that plaintiff, then Fleet would be responsible for that liability." Def.'s Mem. in Supp. of Mot.for Summ. J. at 2, n. 2.
[2] Marilyn Champ and Gloria Cassidy, relationship administrators in the private client group at Fleet during this time period (Champ Tr. at 2-3; Cassidy Tr. at 3), testified at deposition concerning Fleet's customary banking practices. Prior to disbursing a depositor's funds, Fleet's employees compare the offset slip with the cashier's check and verify that the check paying out the funds is made payable to the account holder. (Champ Tr. at 5, 7, 9; Cassidy Tr. at 15.) Fleet's employees also ascertain that the person requesting the transaction is either a signer on the account or the person designated to act on behalf of the account. (Cassidy Tr. at 10.)
Where a trust holds an account, Fleet does not necessarily require the signature of the trustee for a requested transaction. (Id. at 14.) Fleet frequently opens accounts at the request of attorneys. (Id.) Where an attorney requests that Fleet open an account in the name of a trustee or trust, that attorney is commonly the person who signs on the account, determines that the account should be closed, or directs how to disburse the account proceeds. (Id.) Fleet does not contact the trustee to determine whether a transaction is authorized. (Id. at 14-15.)
[3] The Hospital Trust Checking Account was opened in or about 1989. On April 15, 1996, R. Ciccone signed a document granting E. Ciccone power of attorney with respect to all business with Hospital Trust concerning, inter alia, the Hospital Trust Checking Account. This power of attorney remained effective through July 30, 1997.
[4] Plaintiffs claim that Pitassi filled out the two checks.See Pls.' Mem. in Opp'n to Def.'s Summ. J. Mot. at 10 (stating that "Pitassi thereupon fild out the two checks provided to him by Elsie").
[5] On June 25, 1998, per an order of the Rhode Island Supreme Court, Pitassi was disbarred. The order states, in pertinent part: "The nature of the allegations of misconduct are that . . . [Pitassi] wrongfully converted trust funds to his own use over which he had control as attorney for the trust." Order datedJune 25, 1998 at 1. Furthermore, on or about October 10, 2000, Associate Justice Pfeiffer of the Superior Court entered a Restitution Order requiring Pitassi to make restitution to R. Ciccone, in his capacity as trustee, in the amount of $95,000.Restitution Order at 1. The Restitution Order was made without prejudice to R. Ciccone's and E. Ciccone's rights in this action.Id.
[6] In Count VIII, Plaintiffs allege that: (1) by issuing and entering into the CD agreement with R. Ciccone, Fleet entered into a contract with R. Ciccone to pay him the full amount of the CD, with interest, upon maturity; (2) under the terms of the CD, Fleet was to pay R. Ciccone $95,000, plus interest, which sum was payable to R. Ciccone on March 2, 1997; and (3) Fleet failed to pay R. Ciccone the $95,000, when due in accordance with the CD agreement, and to date, has not paid R. Ciccone for the CD.Amended Verified Complaint at 20.
[7] With regard to Count IX, Plaintiffs claim that Fleet's actions, including its issuance of the Fleet Cashier's Check payable to R. Ciccone with proceeds from the CD, its delivery of the Fleet Cashier's Check to Pitassi without signatory or other authority from R. Ciccone, and its payment on the Fleet Cashier's Check, constituted a breach of Fleet's contract with R. Ciccone.Amended Verified Complaint at 21.
[8] In Count VIII, E. Ciccone "demands judgment against . . . Pitassi for compensatory damages in such amount as may be deemed necessary and proper and in excess of the jurisdictional minimum of this court, plus interest and costs, and for punitive damages, and for such other relief as this Court may deem necessary and just." Amended Verified Complaint at 19. In connection with Count IX, R. Ciccone demands relief identical to that requested in Count X. Id. at 21-22.
[9] Economic loss has been defined as "costs associated with repair and-or replacement of a defective product, or loss of profits consequent thereto." Gail Frances, Inc. v. Alaska DieselElectric, Inc., 62 F. Supp.2d 511, 517 (D.R.I. 1999).
[10] Fleet also owed R. Ciccone a duty to know his signature.See Volpe, 710 A.2d at 663.
[11] This Court's ruling is consistent with Justice Hurst's February 22, 2000 denial of Fleet's prior summary judgment motion as to Count X.
[12] Plaintiffs concede that their tort claims against Hospital Trust, embodied in Counts XI and XII, prove inconsistent with a successful breach of contract claim against Fleet. Pls.' Mem. inOpp'n to Def.'s Summ. J. Mot. at 37. Plaintiffs state that "if this Court in fact decides to dismiss the claims against Hospital Trust, it should do so only because Plaintiffs cannot recover on both theories simultaneously." Id.
[13] Section 6A-3-419, as recited by this Court, was repealed as of July 1, 2001. The Court, however, applies the statute as it existed during 1997, the time period at issue.
[14] A "depositary bank" consists of "the first bank to which an item is transferred for collection even though it is also the payor bank." G.L. 1956 § 6A-4-105(a).
[15] A "collecting bank" constitutes "any bank handling the item for collection except the payor bank." Section 6A-4-105(d).
[16] "Good faith" denotes "honesty in fact in the conduct or transaction concerned." G.L. 1956 § 6A-1-201(19).
[17] Section 6A-3-419(3) has been replaced by G.L. §6A-3-420(c), which provides:
 "A representative, other than a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out."
Explaining this change, Comment 3 to Section 6A-3-420 notes that "[s]ubsection (3) of former section 3-419 drew criticism from the courts, that saw no reason why a depositary bank should have the defense stated in that subsection."
[18] See also 4 William D. Hawkland et al., Uniform Commercial Code Series § 3-419:5 (2003) (stating that the two theories utilized by courts to circumvent § 3-419(3), one of which originated with Cooper, "clearly misread" § 3-419(3)).
[19] Having found that Fleet is entitled to summary judgment on Count XI, pursuant to § 6A-3-419(3), and Count XII, based on §6A-3-419's displacement of a negligence claim, this Court will consider Fleet's ratification arguments only with regard to Count X.
[20] This Court declines to consider Fleet's ratification argument to the extent that Fleet intends to apply the same to the issuance, negotiation, and payment of Check Number 357. Elsie Ciccone received payment for Check Number 357, and therefore, any recovery in this lawsuit based on Check Number 357 would be double.